**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

No. 94-41165

UNITED STATES OF AMERICA

Appellee,

VERSUS

JUAN GONZALES and
RAMSEY RAMIRO MUNIZ,

Appellants.

Appeal from the United States District Court
for the Eastern District of Texas

March 20, 1996

Before REYNALDO G. GARZA, WIENER, and STEWART, Circuit

Judges.

PER CURIAM:

**BACKGROUND**

Appellants, Ramsey Ramiro Muniz and Juan Gonzales, challenge their convictions for possession of cocaine with intent to distribute, in violation of 21 U.S.C. §841(a)(1), and for conspiring to possess cocaine with intent to distribute, in

1

violation of 21 U.S.C. §846.  Muniz and Gonzales were arrested in Lewisville, Texas, a Dallas suburb, as a result of a DEA investigation in March 1994.  The DEA was conducting surveillance of a suspected drug trafficker, Donacio Medina, who arrived in Dallas on March 10.  Muniz, who allegedly had come to Dallas on legal business with Gonzales at roughly the same time, picked up Medina at Love Field and took him to Frisco, Texas.[1]  Muniz and Medina were observed by Dallas DEA agents who had been informed by Houston DEA agents of Medina's trip to Dallas.  DEA Agent Elliott was supplied with additional information that Medina was with Appellants at the Ramada Inn in Lewisville.[2]

---

[1]  Muniz was a former lawyer and political figure, championing the rights of Mexican-Americans in the early 1970s, until his involvement in drug trafficking brought him a prison sentence and disbarment.  After release from prison, Muniz worked as a legal assistant to various firms, helping them obtain clients.  He claimed to be in Dallas to find clients for a Corpus Christi lawyer, Ron Barroso.  Gonzales was an unemployed construction worker who occasionally served as a driver for Muniz. Gonzales had driven Muniz to Dallas on March 8 from Houston.  Muniz had already met with Medina in Houston between February 27 and March 8 ostensibly to arrange legal services for a member of Medina's family.  According to Appellants, the events in Dallas relate to continued discussion of this possibility.

[2]  Elliott confirmed Muniz's and Medina's presence at the Ramada through telephone calls and interviews with the motel staff. Elliott also noted a white Mercury Topaz in the parking lot, the same model in which the cocaine was found.  A shadowy figure named "Hernandez" enters the story at this point.  Medina was allegedly meeting with him at the Classic Inn in Fort Worth around the same time that negotiations were underway with Gonzales and Muniz. Muniz argued that he heard someone else with Medina at the Ramada on the night of March 10 and that person was Hernandez. Hernandez's name will appear at sporadic points in this opinion though little is known about him.  The relevance of this character was unknown to anyone except Muniz who tried to subpoena the desk clerk of the Classic Inn late at trial to verify that Hernandez was at the Classic Inn.  The district court's refusal to enforce that late request is discussed infra.

On March 11, Agent Elliott and four others set up surveillance of Medina's room (218) at the Ramada. That morning at approximately 9:00 AM, the agents observed Medina and Gonzales leave room 218 and walk down to the lobby. Muniz joined them there a few minutes later. The three went to Owens' Restaurant, next to the motel, for breakfast. Seated within earshot were Agents Chavez and Crawford. Chavez, fluent in Spanish, heard Medina say: "I don't know them too well, but the deal will go down and there's going to be a meeting at ten o'clock."[3] Appellants and Medina were in the restaurant about a half hour but the agents heard and understood no other words. Appellants and Medina returned to the motel where Medina loaded his bags into Gonzales's Toyota Camry. Gonzales with Muniz drove Medina to Love Field.[4] Medina went to the boarding area and was not seen again.

On the return to the Ramada, Appellants stopped three times; twice Gonzales used a pay phone and once he stopped at a service station but did not exit the vehicle. Gonzales dropped off Muniz at the Ramada and went one mile to a nearby La Quinta Inn. Muniz was seen entering a white Mercury Topaz which he drove to the La Quinta as well. The five DEA agents followed Gonzales and Muniz to the La Quinta, requesting assistance from local law enforcement.

---

[3] Muniz claimed this comment was made in reference to fundraising efforts to pay for legal representation for Medina's family member.

[4] Muniz allegedly planned to return home on the afternoon of March 11 though Gonzales intended to stay in Dallas. Muniz had made the plane reservations for Medina and someone named Hernandez. The name Hernandez was on a slip of paper with flight information found on Muniz.

Gonzales parked his Camry at the entrance to the La Quinta. DEA Agent Crawford met Gonzales at the door of the motel and introduced himself. Crawford requested identification from Gonzales and, on discovering that Gonzales was not a local resident, asked him his purpose in Dallas. Gonzales claimed he had come from Houston seeking employment. To Crawford's question as to whether he was traveling with anyone, Gonzales stated that he had come alone. Crawford asked for Gonzales's consent to search the Camry. Gonzales assented, but Crawford discovered nothing.

Agent Elliott arrived and asked Gonzales similar questions. Gonzales stated that he had come for work and that no one else had been in his car recently. Elliott also asked if Gonzales was familiar with the man driving the white Topaz. Gonzales denied knowing him. Crawford asked for and received permission to search the white Topaz which Gonzales granted.

Muniz had parked at a different section of the La Quinta Inn parking lot. He locked the car and headed away from the hotel past two restaurants toward a Honda dealership. He looked over his shoulder at the parking lot as he walked off. He also saw Agent Chavez and waved at him. On his own admission, Muniz had seen the marked police cars there, suspected possible trouble, and sought to get to a phone and talk to a lawyer.

Agents Chavez and Cash pursued Muniz, intercepting him at the Honda dealership. They stopped him, identified themselves and requested identification from him. Muniz was unable to produce anything but his business card. The agents requested and were

granted permission to pat down Muniz for weapons. Muniz twice denied having driven a car despite Agent Chavez's statement that he had seen Muniz in the white Topaz.[5] Agent Cash had a few more questions to which Muniz explained his legal business in Dallas, told of his arrival in Dallas, denied knowing about the white car, and stated that a man named Hernandez had driven him to the La Quinta. In response to other questions, Muniz confirmed that Gonzales was the man in the Camry and claimed that he (Muniz), was no longer "in the business."

To escape a growing crowd, the agents suggested that the conversation be continued at the La Quinta. Muniz voluntarily consented to go with them to the La Quinta. There, Cash conferred with Elliott as to what had been learned from Muniz. Crawford went to assist Chavez. Cash again questioned Gonzales about his residence and purpose in Dallas. Gonzales repeated his explanation, stating that he had driven to Dallas early that morning.[6]

Upon request by the agents, Muniz went and sat on a grassy area near the Topaz.[7] The court found no evidence of coercion in the agents' request. Chavez, meanwhile, discovered that the white Topaz was rented in the name of Gonzales and was three days

---

[5] Muniz asserted that these fabrications emerged from his state of panic.

[6] Gonzales left Dallas and drove to his home in Mathis, Texas, on a family matter on March 9 but returned to Dallas on March 11.

[7] According to Appellants, one hour passed before the investigation culminated in the discovery of the cocaine.

overdue.[8]  Chavez asked if he could search Muniz for the key. Muniz reportedly assented.  Chavez found the key in Muniz's sock. Muniz did not respond when asked why he had put the key in his sock.  Crawford took the keys and requested permission from Gonzales to open the trunk to which Gonzales stated that that was not a problem.[9]

Before Crawford could open the trunk, a police canine unit arrived and the dog alerted to the trunk of the Topaz.  Crawford asked Muniz if he had anything to say about the car, but Muniz again said nothing.  Inside the trunk were 40 kilograms of 88% pure powder cocaine in boxes.  Appellants were given Miranda warnings and then formally arrested.

Appellants filed a pretrial motion to suppress evidence gathered after the stops, namely the contents of the Topaz and its keys found on Muniz.  After an evidentiary hearing, the trial court denied that motion for the reasons stated in oral and written rulings.  The court also denied Muniz's at-trial request to enforce a subpoena for the desk clerk of the Classic Inn to come verify a registration record for a man named Hernandez.  Appellants were convicted and the court sentenced Muniz to life in prison and Gonzales to 168 months.[10]  Their timely appeals are now before the

_____

[8] Gonzales rented the Topaz on March 5, 1994, from Budget Rental Car in Houston, Texas.

[9] Muniz claims that the agent first requested his permission to open the vehicle but that he refused.

[10] Both defendants had prior drug convictions.  Muniz's two prior drug offenses resulted in a sentence enhancement to life imprisonment.

Court.


## DISCUSSION

Gonzales and Muniz argue that the motions to suppress should have been granted and that evidence of possession and conspiracy was insufficient to support the convictions. Muniz additionally argues that the court wrongfully failed to enforce his subpoena, that the enhanced sentence was unconstitutional and also impermissible because the government failed to give proper notice that it would seek an enhanced sentence based on the prior convictions.[11] These issues will be dealt with in turn.


## A. The Appellants' Motions to Suppress.

Prior to trial, appellants filed separate motions to suppress. Gonzales claimed that the stop, arrest, search and interrogation and the seizure of items and papers were effected without reasonable suspicion or probable cause. Muniz also alleges that he was arrested without probable cause; that any detention exceeded the scope of a permissible detention based on reasonable suspicion; and that the seizure of the key and eliciting of statements were illegal. The government does not assume that the stops were

---

[11] Gonzales also attacks the reliability of the narcotics dog in one paragraph, arguing that no probable cause existed because of the dog's unreliability. The court found the dog to be reliable, rejecting the evidence of Gonzales at the suppression hearing. The government supports its arguments based on consent and reasonable suspicion and scarcely mentions the issue of the dog on this appeal. Because Gonzales has shown no clear error in the district court's finding on the reliability of the drug dog, we will not disturb the finding.

investigative detentions but asserts that the encounters were at least initially consensual, that the searches were by consent, and that even if the encounters were Terry stops, reasonable suspicion existed to detain the Appellants. The government also contests Appellants' standing to challenge the search of the Topaz. At the suppression hearing, Gonzales did not testify or articulate any factual dispute and provided expert testimony only as to the reliability of the drug dog. Muniz conceded that he had no privacy interest in the vehicle but complained that the statements elicited from him and the search resulting in the keys were both unlawful. Muniz also testified as to alleged coercive behavior on the part of the agents. The district court orally denied both motions, stating that there was reasonable suspicion to make the stop, that there was probable cause to make the arrest later, that the dog was reasonably reliable and that the consents given to search were voluntary.

Subsequently, the court issued a written order on Muniz's motion, finding inter alia the following facts: 1) prior to March 11, 1994, the agents suspected that appellants were involved in illegal drug activity; 2) Agent Chavez determined that the restaurant conversation was regarding a drug deal, based on his law enforcement experience; 3) Muniz was not in custody until the actual arrest, no reasonable person of Muniz's intelligence would have thought he was, he was never told he had to answer questions or could not leave the area, and he was aware of his right to refrain from giving consent; 4) the search and questioning of Muniz

8

were voluntary; 5) the agents were dressed in civilian clothes and displayed no weapons; 6) Muniz denied knowledge of the car; 7) and Muniz was not arrested until after the discovery of the cocaine. The court issued no written order on Gonzales's motion.

Appellate review of a district court's ruling on a motion to suppress based on testimony at a suppression hearing is subject to the clearly erroneous standard. U.S. v. Cooper, 43 F.3d 140, 144 (5th Cir. 1995). Questions of law are of course reviewed de novo, but questions of fact are accepted unless the district court's findings were clearly erroneous, or influenced by an incorrect view of the law. U.S. v. Muniz-Melchor, 894 F.2d 1430, 1433 (5th Cir.), cert. denied 495 U.S. 923 (1990). Furthermore, the evidence must be viewed in the light most favorable to the party prevailing below, except where such a view is either not consistent with the district court's findings or is clearly erroneous considering the evidence as a whole. U.S. v. Shabazz, 993 F.2d 431, 435 (5th Cir. 1993). We affirm the lower court's denial of the Appellants' motions.

1. Appellants' standing to challenge the search of the Topaz.

The government contends that appellants lack standing to challenge the search of the Topaz. Muniz conceded at the hearing that he lacked standing to challenge the rental car search, that he had no expectation of privacy in the rental car. Thus, this discussion will focus on Gonzales. The government argues that although Gonzales leased the rental car, the fact that he did not

9

drive the car to the La Quinta and willingly gave the car keys to Muniz eliminated his expectation of privacy in the car.  U.S. v. Nunn, 525 F.2d 958, 959 (5th Cir. 1976) (court found lack of standing for owner of truck who was not driving it when it was seized with illegal immigrants lying in the truck's open bed).

The government concedes that it did not raise the issue of standing before the district court but argues for an exception to waiver.  U.S. v. Amuny, 767 F.2d 1113, 1121 (5th Cir. 1985).  It offers this Circuit's exception to the waiver rule for situations where "no facts are adduced [by the defendant] at the hearing from which the government could reasonably have inferred the existence of the defendant's standing." U.S. v. Cardona, 955 F.2d 976, 981- 982 (5th Cir.), cert. denied 113 S.Ct 381 (1992) (exception to waiver allowed when defendant had no ownership interest in the vehicle and did not focus on the search of the car at the hearing). The government's argument is based on the facts noted above (Gonzales turned over the keys and let Muniz drive to the La Quinta) and the fact that Gonzales did not assert standing at the hearing or testify at the hearing.  The government thus contends that it was not presented with facts from which it could infer that Gonzales had an expectation of privacy in the Topaz.

The question before the Court is whether facts were adduced from which the government could have inferred that Gonzales was claiming a privacy interest.  Such a claim would have required a response on the part of the government.  Gonzales leased the car, drove it around extensively, and, as the government notes, was

10

asked by the agents if they could search the vehicle. According to the government, Gonzales raised none of these fact concerns in a brief or testimony. Gonzales did however inquire about the vehicle on cross-examination and not just in regard to the drug dog. This should have triggered a government response; thus, the government waived the issue. Gonzales has standing to challenge the search of the Topaz.

     2.    Nature of the initial encounters between appellants and agents.

The district court made a specific finding with regard to Muniz that the <u>initial</u> part of the encounter was a mere consensual encounter, unregulated by the Fourth Amendment. This finding of fact is subject to reversal only if clearly erroneous. <u>U.S. v. Butler</u>, 988 F.2d 537, 541 (5th Cir.), <u>cert.</u> <u>denied</u> 126 L.Ed.2d 359 (1993). No specific finding on this question was made with regard to Gonzales. Analysis of the initial part of the Gonzales's stop is nonetheless necessary in determining the propriety of the court's general denial of Gonzales's motion to suppress. Appellants contend that the stops amounted to investigative detention without reasonable suspicion. The government contends that the facts surrounding the encounter, viewed in the light most favorable to the prevailing party, show that the initial part of the encounters were consensual.

Gonzales argues that he did not feel free to go and that the initial stop was an investigative detention. An agent stopped Gonzales at the door to the La Quinta, identified himself and asked

11

Gonzales for identification. Then the agent asked Gonzales's purpose to be in Dallas and asked permission to search Gonzales's Toyota Camry. The agent also stated that the car that Gonzales was traveling in was suspected of being used to transport drugs. During this discussion, another agent arrived. Shortly thereafter, Gonzales lied about the Topaz.

Muniz merely assumes that the initial stop was an investigative detention. Two agents caught up with Muniz as he was approaching a car dealership. Muniz had seen agents in the parking lot of the La Quinta and had left the scene. They stopped him and patted him down; the court found that Muniz consented to the frisk for weapons. The agents asked for identification and posed several questions to him about his purpose in Dallas and about the white car. As a crowd formed, the agents allegedly asked Muniz to accompany them to the La Quinta. According to the government, Muniz voluntarily consented to go with them to the La Quinta. There, Muniz was questioned again and allegedly agreed to another frisk. That search resulted in the find of the Topaz keys in Muniz's sock.

The relevant test in determining whether the initial encounters described above were actually investigative detentions, enunciated in Florida v. Bostick, 501 U.S. 429, 434 (1991), is whether a reasonable person in the circumstances presented would feel free to disregard the agents and go about his or her business. The government offers the following facts in defense of the court's finding: 1) the agents wore no uniforms and displayed no weapons;

12

2) the agents did not overwhelm appellants in numbers; 3) the agents identified themselves truthfully and asked permission to speak with appellants; 4) the encounters occurred in a public open place and appellants' movements were not blocked; 5) no threats were made. According to the government, the circumstances, when viewed in their totality, support a conclusion that the initial conversations were not seizures.

There is no indication from the facts of the initial stop of Gonzales that the agents made any display of authority beyond identifying themselves or attempted to control Gonzales's movement. In U.S. v. Galberth, 846 F.2d 983, 989 (5th Cir.), cert. denied 488 U.S. 865 (1988), this Circuit upheld a lower court finding that an encounter was consensual where the police merely identified themselves, requested identification and asked questions. See also U.S. v. Encarnacion-Galvez, 964 F.2d 402, 410 (5th Cir.) (encounter consensual where police just identified themselves, requested proof of citizenship, but did not attempt to block movement of defendant), cert. denied 506 U.S. 945 (1992); U.S. v. Valdiosera-Godinez, 932 F.2d 1093, 1099 and n.2 (5th Cir.) (neither the fact that the DEA agents identified themselves nor the presence of other officers automatically converted encounters into an investigatory detention), cert. denied 124 L.Ed.2d 275 (1993). There is one troubling element: the officers informed Gonzales that the car he was driving was suspected of being used to transport drugs. This may have pushed the encounter, which was initially consensual, to being a Terry stop.

13

This Circuit, in Galberth, 846 F.2d at 990 n.11, noted that a statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence that the fourth amendment has been implicated.  See also Valdiosera-Godinez, 932 F.2d at 1099 (citing U.S. v. Berry, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (statement by officer that "'individuals are suspected of smuggling drugs'" is a factor to be given great weight in determining whether the stop was investigative detention).  The statement by the agent in the instant case about Gonzales's car being suspected may have implicated the Fourth Amendment.  However, as discussed below, the agents likely had reasonable suspicion to detain him at that point anyway and the stop still appears, at its initial phase, to have been consensual.

The situation with Muniz is only slightly more problematic.  The police initially caught up with Muniz and then asked to frisk him.  Apparently, Muniz voluntarily agreed to be frisked and get in the car. See discussion infra.  There is no evidence of coercion.  He disputes this characterization but, viewed in the light most favorable to the government, the record supports the finding of the trial court that the stop of Muniz was at least initially a consensual encounter.


3.   Consent to the searches of person and automobile.

Appellants challenge the legality of the searches performed by the agents of the Topaz and of Muniz's person.  The government contends that the court properly found in its oral and written

14

rulings that Gonzales and Muniz voluntarily consented to the searches of their persons and vehicles. The government maintains that the searches were voluntary regardless of how the encounters were classified. The district court's finding that the government had met its burden of proving by a preponderance of the evidence that appellants' consent was voluntary is reviewed only for clear error. Cooper, 43 F.3d at 144. Additionally, "'where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses.'" U.S. v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993) (citing U.S. v. Sutton, 850 F.2d 1083, 1086 (5th Cir. 1988), cert. denied 124 L.Ed.2d 647 (1993)).

This Court considers six factors in determining whether consent is given voluntarily: the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with the police, the defendant's awareness of his right to refuse consent, the defendant's intelligence, and the defendant's belief that no incriminating evidence would be found. No single factor is dispositive. The question of voluntary consent is a fact to be discerned from the totality of circumstances. Cooper, 43 F.3d at 144.

The government has a winning argument in favor of voluntary consent under the six-factor test. As discussed above, arguably Appellants were not detained at any time until their actual arrest. According to the government, they were not told they could not

15

leave.  Nor is their evidence of coercion.  There is a chain of consent leading down to the finding of the key pieces of evidence. Gonzales was asked if the officers could inspect the Topaz and he apparently consented.  As stated above, Muniz apparently allowed the initial frisk, went with officers to the La Quinta and allowed the search of his person.  As for intelligence and awareness of right to refuse consent, the government wisely notes that Muniz was a former attorney who undoubtedly was aware that he did not need to consent to the officers' requests.[12]  There is no evidence that Gonzales was of below average intelligence.  Additionally, Gonzales himself had a prior record and experience with law enforcement procedures.  The government did not inform either of Appellants that they need not consent.  However, there is no absolute requirement that the government establish that the Appellants knew they could refuse; it is merely one of the factors. Cooper, 43 F.3d at 148.  Thus, the government has met its burden of proof on the first five elements.

Whether the Appellants believed no evidence would be found is not difficult to discern.  Appellants' actions are consistent with the government's theory that both Appellants wanted to distance themselves from the Topaz.  That Muniz allowed the second search suggests that he believed that the Topaz keys would not be discovered since they had not been discovered on the first search. Gonzales apparently believed he could avoid association with the

_____

[12] The lower court found in its suppression ruling that Muniz had considerable experience in the criminal law and the criminal justice system as a lawyer and convict.

16

car as well since Muniz was the one last seen driving it.  Thus, each may have believed that no evidence connected to them could be found.  No single factor of the six is dispositive,[13] so even if this factor is weak, the court did not err in finding the existence of voluntary consent.  This is especially true given the amount of deference shown to the lower court's ability to view the demeanor of the witnesses.

4.    Reasonable suspicion for investigative detention.

Though we believe that the searches were by consent, for completeness's sake, we will address the Appellants' arguments that the stops were investigative detentions.  Appellants analyze the events, asserting that the stops were investigative detentions made improperly without reasonable suspicion.  The government argues that even if the stops are classified as Terry stops, the agents were justified in their actions.

At the time the agents stopped Gonzales and Muniz, the agents knew the following about them: 1) they were connected with the activity of Medina, a suspected drug trafficker with whom the DEA was negotiating a drug sale; 2) On March 11, Medina met with Gonzales and Muniz and stated that he did not know the other parties to the deal but that the deal would still occur at 10:00 AM; 3) Medina left town before 10:00 that morning, with the other two presumably remaining to complete the deal (they were the last two to meet with Medina before he left town);  4) Gonzales and

---

[13] Cooper, 43 F.3d at 144.

Muniz stopped to use pay phones as they headed from Love Field to the Ramada; and 5) they moved one mile from the Ramada to the La Quinta. With regard to Muniz, the government also observed him enter the parking lot and then leave when he realized there were officers there. He was seen watching over his shoulder at the parking lot. The government argues that the above facts are enough to create a "reasonable suspicion" that illegal behavior was occurring.

In U.S. v. Simmons, 918 F.2d 476, 481 (5th Cir. 1990), two DEA agents in New Orleans stopped and questioned two passengers exiting a flight from Los Angeles without specific prior knowledge about either passenger. One appeared intoxicated, the other nervous, and both were coming from a known a drug source city. This Court held that these facts along with an improbable answer from one as to why he was in New Orleans were enough to allow for reasonable suspicion. Id.

In our estimation, the instant case presented the DEA agents with enough reasonable suspicion to merit detention after the initial consensual encounters. Given both Agent Chavez' 20 years experience with the DEA and the presence of Medina, Chavez was probably rational in concluding that the transaction discussed at Owens' restaurant involved narcotics. The consistent actions after Medina left would have contributed to the reasonable suspicions of the agents leading to the questions and searches.

5. Conclusion

The district court did not err in denying the motion to suppress. The stops were at least initially consensual encounters. From the initial consensual encounters came additional information to justify investigative detention. The amount of information the agents had seems to make their suspicions reasonable. Had the agents lacked reasonable suspicion, the voluntary consent given with regard to the searches would still allow the evidence to come in.[14] Appellants were not under arrest until the discovery of the cocaine in the trunk at which time probable cause obviously existed.[15] The evidence on behalf of consent both in the encounters and the searches is strong enough that the lower court made no clear error in denying the motions to suppress.

**B.    Sufficiency of the evidence for convictions of conspiracy and possession.**

Gonzales and Muniz challenge the sufficiency of the evidence on which they were convicted of conspiracy to possess cocaine with intent to distribute and the completed substantive offense. When considering a challenge based on sufficiency of the evidence, the

---

[14] The consent obtained in such circumstances is not invalidated by the absence of reasonable suspicion as long as the six factors, when considered as a whole, support the district court's finding. Kelley, 981 F.2d at 1471; Shabazz, 993 F.2d at 439 n.10. See consideration of consent supra.

[15] Our conclusion that the stops were at most investigative detentions with reasonable suspicion and that the searches performed were by consent obviates all but cursory disposal of the Appellants' contention that the stops were arrests without probable cause prior to the actual arrests.

19

reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. U.S. v. Chavez, 947 F.2d 742, 744 (5th Cir. 1991). Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of innocence. U.S. v. Dean, 59 F.3d 1479, 1484 (5th Cir. 1995), cert. denied 133 L.Ed.2d 696 (1996).

To establish a drug conspiracy under 21 U.S.C. §§ 841(a)(1) and 846, the government must prove: 1) the existence of an agreement between two or more persons to violate federal narcotics laws; 2) the defendant's knowledge of the agreement; and 3) the defendant's voluntary participation in the agreement. U.S. v. Gallo, 927 F.2d 815, 820 (5th Cir. 1991). Circumstantial evidence will suffice to demonstrate the existence of a conspiracy. Id. The existence of the agreement, the defendant's knowledge, and the defendant's participation in the conspiracy may be inferred from the "'development and collocation of circumstances.'" Id. (citing U.S. v. Lentz, 823 F.2d 867, 888 (5th Cir.), cert. denied 484 U.S. 957 (1987)). Mere presence at the scene of the crime or close association with co-conspirators will not alone support an inference of conspiracy but are factors that the jury may consider in finding conspiratorial activity. Id.

To convict a defendant of possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1), the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2)

20

possessed cocaine (3) with intent to distribute it. Id. Proof of possession will usually depend on inference and circumstantial evidence. Id. When evidence is sufficient to establish the defendant's participation in a conspiracy to possess narcotics, the defendant will be deemed to possess the drugs through the co-conspirator's possession.

This opinion will briefly consider the evidence against each defendant.


1.    Gonzales

Gonzales and Muniz were acquainted prior to the events of March 1994. Gonzales had served as Muniz's driver on occasion. The two of them met with Medina, a suspected drug trafficker, in Houston. Gonzales, though unemployed during this time, rented the white Topaz and failed to return the car on time. After going home for a family emergency, Gonzales returned to the Dallas area despite the fact the Muniz was leaving by airplane. Gonzales was at the March 11 morning meeting with Medina at which the "deal" was discussed. Gonzales made several phone calls from pay phones on his return from the airport.

When questioned by the agents at the La Quinta Inn, Gonzales claimed he had come to Dallas to seek employment despite the absence of any evidence of a job search. Gonzales lied to the agents when he asked whether he had any passengers in his vehicle recently and whether he had been to the airport. Gonzales had in fact given the keys of the white Topaz to Muniz shortly before

Muniz drove it from the Ramada Inn and _after_ the cocaine had been placed in the car. The jury also had evidence of Gonzales's prior convictions on the issue of intent.

While much of the evidence above amounts to mere presence or association with more culpable figures, the totality of circumstances would allow the jury to infer participation in the conspiracy. U.S. v. Dean, 59 F.3d at 1484. The jury chose not to believe Gonzales's claim that he was on a job search. Gonzales's presence at the March 11 meeting when combined with his fabrications regarding the vehicle and delivery of the keys to Muniz after the cocaine was already in the vehicle are sufficient evidence to sustain the convictions.

2. Muniz

The circumstances incriminating Muniz are obviously similar to those above. He met with Medina in Houston, was present at the March 11 meeting where Medina set the time for the "deal" and lied about not having driven the Topaz. In addition the following items of evidence are present: 1) Muniz had a level of reported income that was inconsistent with his frequent statewide travel, suggesting income from illicit sources; 2) Muniz met and spoke with Medina on more occasions than Gonzales, including one meeting on the night before the arrests (the Topaz, driven by Muniz, was at the Ramada, Medina's hotel); 3) Muniz drove the Topaz after the cocaine had been placed in the car; 4) Muniz, watching over his shoulder, left the area of the La Quinta after spotting law

22

enforcement officers; 5) Muniz hid the keys to Topaz in his socks, though he allowed the agents to search him.

While none of the above are conclusive proof of conspiracy and possession, again it is the totality of circumstances that would allow a jury to find guilt beyond a reasonable doubt. Control of the vehicle coupled with the attempt to flee the scene and the lies about use of the vehicle are enough for the jury to conclude that Muniz possessed the contraband within. U.S. v. Carrillo-Morales, 27 F.3d 1054, 1064-1065 (5th Cir. 1994), cert. denied 130 L.Ed.2d 1119 (1995). From there, one can build the entire conspiracy. Gonzales possessed the cocaine through his co-conspirator Muniz and both of them worked together on the "deal." The jury did not have to believe Muniz's story that he was in Dallas on legal business or that he left the hotel area looking for a pay phone though he passed two restaurants before being stopped. The evidence against the two is sufficient to support the convictions.

## C. Muniz's subpoena request.

Muniz appeals the lower court's denial of his request at trial for the court to enforce the defense subpoena issued to the desk clerk at the Classic Inn in Fort Worth. Muniz claims the court's failure to enforce the subpoena is a violation of his Sixth Amendment right to compulsory process and Fifth Amendment right to due process. According to Muniz, the desk clerk was in possession of certain registration records that would allegedly corroborate Muniz's narration of the events. The lower court denied the

23

request, which was made at the end of the defense's case-in-chief. This Court will review the decision to deny the subpoena request under an abuse of discretion standard.  U.S. v. Ojebode, 957 F.2d 1218, 1222 (5th Cir. 1992), cert. denied 122 L.Ed.2d 683 (1993); U.S. v. Bowman, 636 F.2d 1003, 1013 (5th Cir. 1981).

The Fifth and Sixth Amendments guarantee a defendant the rights to a fair trial and compulsory process but those rights are not absolute.  Butler, 988 F.2d at 540.  When requesting a court to subpoena a witness, a defendant such as Muniz has the duty to demonstrate the necessity of the witness's testimony.  U.S. v. Ramirez, 765 F.2d 438, 441 (5th Cir. 1985), cert. denied 88 L.Ed.2d 786 (1986); U.S. v. Webster, 750 F.2d 307, 329-330 (5th Cir. 1984), cert. denied 85 L.Ed.2d 855 (1985); U.S. v. Moore, 917 F.2d 215, 230 (6th Cir. 1990), cert. denied 113 L.Ed.2d 654 (1991).  The government may respond by demonstrating that the facts upon which the defense relies are inaccurate, or that the evidence sought is immaterial, irrelevant, cumulative or otherwise unnecessary. Webster, 750 F.2d at 329-330.

The hotel clerk would have verified the hotel registration card which showed that a man named Danny Hernandez had stayed at the Classic Inn from March 6-10.[16]  Muniz, in an attempt to account for all of his time in the Lewisville area, hoped that the jury could infer the following: that D. Hernandez was the Hernandez on the slip of paper found on Muniz on which Muniz had written airline

---

[16] Government evidence would have shown that Danny Hernandez provided no identification at the Inn and provided a false address.

reservations for "Medina, Hernandez", that D. Hernandez was an unknown person who allegedly called out to Medina on March 10 at the Ramada Inn and that Hernandez and Medina had access to the white Topaz. Muniz stated that he did not know Hernandez but that Hernandez was the owner and driver of the white Topaz. Muniz attempted to account for his numerous phone calls (30+) from the hotel as well as the other above-described events. Muniz also claimed that the evidence would have corroborated Muniz's testimony that he called the Classic Inn and spoke to Medina about their alleged legitimate business before the Owens' meeting.

The lower court denied Muniz's request because the registration records regarding Danny Hernandez lacked relevance and could possibly confuse the jury. The court pointed to the absence of any proof that the Danny Hernandez who stayed at the Classic Inn was the Hernandez about whom Muniz had spoken, especially given the common nature of the surname Hernandez, and the lack of any proof that Muniz had made a telephone call to Hernandez at the Classic Inn. Danny Hernandez who stayed at the Classic Inn checked out a day before Muniz allegedly made a plane reservation for him. Additionally, had Muniz been able to connect Medina and Hernandez together with the white Topaz, this would hardly make either of these two figures or Muniz look less culpable.

The lower court did not abuse its discretion in refusing to enforce the subpoena request. Muniz failed to prove that the evidence was relevant. Even assuming the registration records were relevant, evidence that a Danny Hernandez had stayed at the Classic

Inn would have misled the jury given that there was no evidence that this D. Hernandez was the Hernandez referred to by Muniz.

**D.    The lawfulness of Muniz's sentence**.

Muniz contests the lawfulness of the enhanced sentence he received on two grounds.  He argues that the government failed to comply with the formal requirements of 21 U.S.C. § 851(a) and that 21 U.S.C. § 851(e)'s provision precluding collateral attacks on previous convictions if five years or older is unconstitutional. The sufficiency of a § 851(a) information and the constitutionality of § 851(e) are questions of law that will be reviewed de novo. U.S. v. Steen, 55 F.3d 1022, 1025 (5th Cir.), cert. denied 133 L.Ed.2d 500 (1995).

1.    Sufficiency of an Information under 21 U.S.C. §851(a)

Muniz received a life sentence based on the enhancement provisions of 21 U.S.C. § 841(b) because of his two prior drug convictions.  Several months prior to trial, the government filed a "Notice of Prior Convictions" for the purpose of informing court and defendant that the government would seek to use the two prior convictions to seek an enhanced sentence.  Such notice is required by 21 U.S.C. § 851(a).  21 U.S.C § 851 states:

> (a)(1)  No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, * * * the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

26

The notice given by the government stated

> Notice is given that in accordance with Title 21, United States Code, § 851, the United States intends to prove that RAMSEY RAMIRO MUNIZ, Defendant herein, has two prior convictions by two different courts for felony drug offenses, and as such, if convicted of a violation of 21 U.S.C. 841(a)(1), the penalty range shall be a fine of not more than $8,000,000 and imprisonment for a mandatory term of life without release.

The notice then described the specific convictions (one in the Southern District of Texas involving 1,100 pounds of marijuana and the other in the Western District of Texas involving 822 pounds). Muniz argues that the notice given is inadequate because it is not called an "Information" as referenced in the statute and does not state the government will "rely upon" the convictions mentioned in the notice.

Muniz's requirements are beyond those of the statute. It is true that the prosecution must comply with § 851's procedural requirements or the district court cannot enhance a defendant's sentence. Id. at 1025. The essential question, though, is whether timely notice (before trial) has been given of which convictions will be relied on so that a defendant has an opportunity to respond. Id. at 1027; U.S. v. Gonzalez-Lerma, 14 F.3d 1479, 1485 (10th Cir.), cert. denied 128 L.Ed.2d 484 (1994). More than one Circuit, including this one, has observed that § 851 does not state the form in which the "information" is to appear. Steen, 55 F.3d at 1027 (information with misstated priors sufficient because defendant not prejudiced); Gonzalez-Lerma, 14 F.3d at 1485 (information sufficient though defendant alleged mistakes on date and place of convictions); U.S. v. Belanger, 970 F.2d 416, 419 (7th

Cir. 1992) (information which failed to specify prior convictions sufficient when particular conviction were named in a later pre-trial document).

Muniz does not claim that the notice was untimely or that the information was incomplete. His criticism is reserved for the title and wording. Because notice was timely given and the facts contained were accurate, the information was sufficient under Steen. As is evident from the "Notice" quoted above, the government informed the defendant that it would use the prior convictions, identified those convictions and did so in a timely manner. § 851 is mentioned specifically in the notice. That the information was titled "Notice" instead of "Information" and did not use the words "rely on" is of no significance since the defendant was aware of the convictions that would be used in connection with an § 851 sentence enhancement. The Government's Notice satisfied the requirements of 21 U.S.C. § 851.


2.    Constitutionality of 21 U.S.C. § 851 (e).

Muniz attacks § 851 (e) as an unconstitutional violation of his rights to equal protection of the laws, due process, and his right not to be subjected to double jeopardy. Muniz claimed that although the two prior convictions mentioned above arose out of guilty pleas in separate jurisdictions, they involved a single conspiracy. Muniz maintained that the Double Jeopardy Clause barred consideration of both convictions separately for enhancement purposes.

The governemt in this case argues that § 851 (e) has a rational basis and should be found constitutional. Also, the government claims that Muniz fails to make out a double jeopardy claim given the temporal and geographical gap between conspiracies.

21 U.S.C. § 851 (e) states:

No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.

Four circuits have held this provision constitutional. U.S. v. McChristian, 47 F.3d 1499, 1503 (9th Cir. 1995); U.S. v. Arango-Montoya, 61 F.3d 1331, 1338 (7th Cir. 1995); U.S. v. Jenkins, 4 F.3d 1338, 1343 (6th Cir. 1993), cert. denied 128 L.Ed.2d 197 (1994); U.S. v. Williams, 954 F.2d 668, 673 (11th Cir. 1992).

The Sixth, Seventh and Eleventh Circuits held that § 851 (e) is a reasonable limitation on defendants to effectuate the purposes of sentence enhancement for recidivists and to eliminate a host of problems with respect to ancient or destroyed records. Jenkins, 4 F.3d at 1343; Arango-Montoya, 61 F.3d at 1338; Williams, 954 F.2d at 673. In McChristian, the Ninth Circuit ruled that the only constitutional challenge permitted under § 851 (e) is a claim that a conviction was invalid because no counsel was appointed to represent the defendant. 47 F.3d at 1402; Arango-Montoya, 61 F.3d at 1336. No other constitutional attack on § 851 (e) survived the Supreme Court's holding in Custis v. U.S., 114 S.Ct. 1732 (1994), that Congress could totally eliminate collateral attacks on prior convictions with regard to sentence enhancement if that body so

29

chose. Except in the limited circumstance in which the prior conviction was obtained in violation of the right to have counsel appointed, a defendant has no constitutional right to challenge prior convictions used to enhance a currently imposed sentence. Id. at 1737-39.

The Court stated that when Congress wants defendants to have a right to collateral attack, such is stated in the statute. The Court offered § 851 as an example of Congress authorizing such attacks when it chose to. Id. The government acknowledges in this case that the Supreme Court in Custis was reviewing not the drug enhancement provisions of 851 (e) but similar provisions in the Armed Career Criminal Act, 18 U.S.C. § 924 (e). Nonetheless, the Supreme Court's logic and statement regarding § 851 in Custis and the decisions of our fellow circuits convince us that § 851's five year limit on collateral attacks is not unconstitutional. A defendant has no right to make a collateral attack under these circumstances unless no counsel was appointed for them. Muniz does not make such a claim and his constitutional attack is thus untenable.[17]

## CONCLUSION

This Court AFFIRMS the district court's denials of Appellants' motions to suppress and AFFIRMS in every respect Appellants'

---

[17] Because we hold that 21 U.S.C. § 851(e)'s five year limit constitutional, we do not reach the issue of whether one of the underlying convictions was actually in violation of the Double Jeopardy Clause.

30

convictions and sentences.