**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 98-20993

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR HUGO CASTILLO-SANCHEZ,
a/k/a VICTOR CASTILLO,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
H-98-CR-14

October 26, 1999

Before POLITZ, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:[*]

Defendant-Appellant, Victor Hugo Castillo-Sanchez ("Castillo-Sanchez") appeals his convictions and sentence for conspiracy to possess marijuana with intent to distribute and aiding and abetting the possession of marijuana with intent to distribute. For reasons set forth below, we affirm Castillo-Sanchez's convictions and sentence.

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

FACTUAL AND PROCEDURAL HISTORY

On December 14, 1997, United States Customs Service agents received information of possible narcotics activity at the Gulfgate Mall in Houston, Texas. The agents were alerted to look for a parked white cab-over delivery truck. Both ground and aerial surveillance located a vehicle matching the description given and set up surveillance around 8:30-9:30 a.m. Approximately one and a half to two hours after surveillance had begun, the agents observed a Hispanic male walk up and get into the white truck and drive away. The agents followed the white truck to a warehouse complex and shortly thereafter, a yellow van, which also had been observed at the mall, arrived and parked behind the white truck.

The drivers got out of their respective vehicles and walked across the street to a repair shop to meet with other Hispanic males. Three or four males placed themselves between the van and the truck, opened the doors to the van, and started moving bale-size packages of what appeared to be marijuana. One of the males carried a bale to the front of the truck, then showed it to the older male and the driver of the truck. They looked at it, smelled it, and carried it back across the street. The driver returned to the back of his truck and several Hispanic males began unloading the truck and placing several bale-size packages into the yellow van. While the truck was being unloaded, the agents observed counter-surveillance being conducted from and around the business and the vehicles. After the van was loaded, the males returned to the repair shop across the street.

Approximately 20 minutes later, a Hispanic male returned to the van and drove off. Agents conducting aerial surveillance followed the van to a residence. The van was parked in the driveway for about 10-20 minutes. The van then traveled to Castillo-Sanchez's residence, where it backed into

a garage and the garage do ors were shut. While the van was en-route to Castillo-Sanchez's residence, agents noticed a black Camry that appeared to be following the van, and engaging in lead-car counter-surveillance activity. In particular, the agents observed the Camry pull into a gas station away from the pumps and telephones, and parked in a position that would allow the driver to observe the vehicles following the van in the neighborhood. Once the van had pulled into the garage of Castillo-Sanchez's residence, agents observed the Camry circling the neighborhood and eventually parking outside the residence.

After the van had left the residence, Castillo-Sanchez entered the Camry and drove it inside the garage. Shortly thereafter, he drove from his residence in the Camry and traveled the same route that the van had taken. During this time, the Houston police had pulled the van over for speeding. The driver had failed to produce proof of insurance. When the passenger rolled down the window, the officers detected a strong odor of marijuana from the back of the vehicle, and an officer saw a tarp covering a bundle in the back on the floor. The officers requested permission to search the van and the driver consented. The officers discovered bits and pieces of marijuana and bags containing the wrappings from marijuana bundles. Consequently, the agents had placed the driver and the passenger under arrest. The agents also recovered from the driver's pocket what appeared to be a torn page from a ledger which had numbers written on it. It was later determined that the driver was Javier Castillo-Sanchez, Castillo-Sanchez's brother.

While Castillo-Sanchez's brother was being arrested, agents had followed Castillo-Sanchez to a strip mall. Once Castillo-Sanchez had parked, the agents parked next to him and exited their vehicles. Agent John Edward Blum ("Blum") had signaled by hand for Castillo-Sanchez to exit the vehicle. Agent Blum was armed but his weapon was out of view. Once agent Blum was satisfied that

3

Castillo-Sanchez was unarmed, he motioned him to the rear of the car. Another agent, Stephen Guillot identified himself and approached with weapon drawn but hidden out of view and advised Castillo-Sanchez in Spanish that they were conducting a narcotics investigation. Another agent asked Castillo-Sanchez for consent to search the vehicle. Castillo-Sanchez retrieved the keys and attempted to hand them to the agent; however, the agent instead asked Castillo-Sanchez to open the car. Castillo-Sanchez popped the trunk open from inside the car. The agents found a black plastic bag containing 50 pounds of marijuana. Castillo-Sanchez put his hands behind his head and waited for the agents to handcuff him. He stated that he did not know where the marijuana had come from.

Shortly thereafter, Castillo-Sanchez gave the officers permission to search his residence. Once at Castillo-Sanchez's residence, the officers administered Miranda warnings and executed a written consent in Spanish to search the residence. The officers recovered 36 bales of marijuana, gross weight 1065 pounds, from the hall closet and 35 bales weighing 996 pounds from the utility room.[1] It was adduced at trial that the marijuana recovered from Castillo-Sanchez's residence was delivered by the yellow van. The agents also recovered an electronic scale and a large plastic bag containing discarded marijuana bale wrappings. Furthermore, the agents discovered a receipt from an automobile storage establishment indicating that the Camry had been released to Castillo-Sanchez after it had been previously towed by the Houston Police Department. Finally, the agents discovered two ledgers in the rear bedroom. The ledgers had numbers written in them. It was later established at trial that the torn page recovered from Castillo-Sanchez's brother came from one of the ledgers. Also, a government expert at trial testified that the numerical entries made in the ledgers and the torn page reflected quantities of marijuana.

---

[1] The net weight recovered was 1937.4 pounds/880 kilograms.

4

The government indicted Castillo-Sanchez and his brother with one count each of conspiracy to possess marijuana with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(vii), and one count of aiding and abetting the possession of marijuana with intent to distribute, 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). Castillo-Sanchez filed a motion to suppress challenging the initial stop, and subsequent search of his car and residence which yielded the marijuana. The district court denied his motion. A jury found Castillo-Sanchez and his brother guilty of both charges. At sentencing, the court found that 2121 kilograms of marijuana was attributable to Castillo-Sanchez and imposed a mandatory minimum sentence of 240 months. The court also imposed 10 years supervised release, a $5,000 fine and a $200 special assessment. Castillo-Sanchez now appeals.

## II.

### DISCUSSION

Castillo-Sanchez argues that the agents lacked reasonable suspicion to support an investigatory stop and detention. Furthermore, he asserts that his consent was invalid because it was not knowingly or voluntarily given. Alternatively, he argues that his consent and the evidence recovered were the fruits of an illegal stop and detention. Finally, Castillo-Sanchez maintains that the district court's finding that he was accountable for over 1,000 kilograms of marijuana was not supported by the record.

5

A.

Reasonable Suspicion

Castillo-Sanchez argues that the district court erred in determining that his seizure was based on reasonable suspicion. He argues that at the time he was stopped, the officers had no information linking the Camry or him to any illegal activity, they had not observed any traffic violations, and they did not even know his identity. He claims that testimony from the motion to suppress hearing reveals that the agents did not know who was driving the Camry when it arrived at the residence where the van had been driven.

We review a district court's ruling on a motion to suppress de novo, "but questions of fact are accepted unless the district court's findings were clearly erroneous, or influenced by an incorrect view of the law." United States v. Gonzales, 79 F.3d 413, 419 (5th Cir. 1996). The evidence is viewed in the light most favorable to the prevailing party, unless this view is inconsistent with the district court's findings or is clearly erroneous based on the evidence as a whole. Id. at 419. A factual finding is not clearly erroneous if it is "plausible in the light of the record as a whole." United States v. Edwards, 65 F.3d 430, 432 (5th Cir. 1995).

A "Terry" stop is a brief investigative stop or detention made for the purpose of verifying or dispelling a law enforcement officer's suspicion of criminal activity. United States v. Sharpe, 470 U.S. 675, 685-86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Brief stops of suspicious individuals to obtain more information do not constitute arrests and do not require probable cause. United States v. Bowles, 625 F.2d 526, 532 n.6 (5th Cir. 1980). A Terry stop is proper if based upon reasonable suspicion that the person is engaged in or will be engaged in criminal activity. Terry, 392 U.S. at 21-22, 88 S.Ct.

6

at 1880.  There must be a "'minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances.'"  United States v. Tellez, 11 F.3d 530, 532 (5th Cir. 1993) (citation omitted).  This  court evaluates the legality of investigatory stops by considering "(1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Kelley, 981 F.2d 1464, 1467 (5th Cir. 1993)(citing Terry, 392 U.S. at 19-20, 88 S.Ct. at 1879). Furthermore, we have recognized that the "[u]se of counter-surveillance techniques by suspects raises a reasonable suspicion."  United States v. Posada-Rios, 158 F.3d 832, 867 n.15 (5th Cir. 1998), cert. denied, United States v. Murga, ___ U.S.___, 119 S. Ct. 1280, 143 L.Ed.2d 373 (1999) (citing Quiroz-Hernandez, 48 F.3d 858, 863 (5th Cir. 1995)).

The evidence adduced at the motion to suppress hearing established that the agents' Terry stop and detention was supported by articulable reasonable suspicion.  First,  the agents observed the Camry driving in close proximity to the yellow van which they suspected was transporting contraband.  Furthermore, they observed the Camry park in a gas station without making a purchase, and circling the neighborhood once the van had pulled into Castillo-Sanchez's garage.  Additionally, shortly after the van had left Castillo-Sanchez's residence, the Camry had pulled off from the residence traveling the same route as the van. Thus, under the totality of the circumstances, the district court's finding that there was reasonable suspicion to make an investigatory stop was not clearly erroneous.

B.

Consent to Search

Castillo-Sanchez argues that his consent to search the car and his consent to search his residence were not made knowingly and voluntarily. He maintains he merely acquiesced to a claim of lawful authority. To support his contention, he claims that his custodial status was involuntary. Furthermore, he argues that five agents converged on him in the parking lot and that two of the agents drew their firearms. He further alleges that he was not told he had the right to refuse consent and that he was not given <u>Miranda</u> warnings contemporaneously with the search of the Camry.

In the alternative, he argues that his consent to the search of the Camry was invalid because it was the fruit of an illegal investigatory stop and detention. He also contends that the written consent to search his residence, which was obtained after he was arrested for possessing the marihuana in the Camry, is also invalid as the fruit of an unlawful seizure and detention.

The Government has the burden of proving that consent was given freely and voluntarily. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); <u>United States v. Tompkins</u>, 130 F.3d 117, 121 (5th Cir. 1997), <u>cert. denied</u>, ___ U.S. ___, 118 S. Ct. 1335, 140 L.Ed.2d 495 (1998). "Voluntarily" means not coerced by threat or force and not granted only in submission to a claim of lawful authority. <u>Schneckloth</u>, 412 U.S. at 233, 93 S.Ct. at 2050. The court considers six factors in evaluating the voluntariness of consent: (1) the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's intelligence; and (6) the defendant's belief that no incriminating evidence will be found. <u>Tompkins</u>, 130 F.3d at 121. No single factor is dispositive, and the voluntariness of consent must

8

be determined from the totality of circumstances.  Id.  Consent to a search must be freely and voluntarily given.  When a district judge's finding of consent is based on oral testimony at a suppression hearing, the "clear error" standard of review of factual findings is "particularly strong since the judge had the opportunity to observe the demeanor of the witnesses."  Gonzales, 79 F.3d at 421 (citation and internal quotation marks omitted).

Because we have already determined that the investigatory stop and detention of Castillo-Sanchez were not unlawful, the consent to search his residence and the evidence obtained therefrom are not "fruits of the poisonous tree."  See United States v. Tedford, 875 F.2d 446, 450-51 (5th Cir. 1989).  However, Castillo-Sanchez's argument that his consent to the search of his car was not voluntary must still be examined.  At the time he gave his consent, Castillo-Sanchez was being detained by the agents.  Although two agents had their guns drawn, there is evidence to support the district court's finding that these guns were not employed coercively and that Castillo-Sanchez may only have glimpsed them.  Castillo-Sanchez was very cooperative with the officers and did not appear to be distressed.  The court found that he was of average intelligence and that the denial of his knowledge of the contents of the trunk was a "ruse."  Castillo-Sanchez testified that the fact that the officers asked him for permission implied that he had a choice, although on redirect he qualified this by saying that it was not a real choice.  In light of the totality of the circumstances, Castillo-Sanchez was not threatened, forced, or ordered to open the trunk and the district court's determination that his consent to search the car was voluntary is not clearly erroneous.  See Schneckloth, 412 U.S. at 233, 93 S.Ct. at 2050.

C.

Sentencing

Castillo-Sanchez essentially attacks his sentence on two fronts. First, he claims that the district court's computation of drug quantity was erroneous. Specifically, he claims that the district court improperly attributed to him quantities of marijuana that were logged in the ledgers recovered from his residence because there was insufficient evidence adduced at trial and at the sentencing hearing to connect the quantities logged in the drug ledgers to him. As such, he argues that he should be held accountable for no more than the 880 kilograms of marijuana that was actually recovered during his arrest. Finally, Castillo-Sanchez claims that the district court's computation of drug quantity under 21 U.S.C. § 841(b)(1)(A) is erroneous because the government failed to show that the drug quantities logged in the ledgers were part of a single transaction.

The offense level of a defendant convicted of a drug offense is determined by the quantity of drugs involved. This quantity includes drugs with which the defendant is directly involved with, or drugs that are attributed to a defendant in a conspiracy as part of his relevant "relevant conduct." See United States v. Puig-Infante, 19 F.3d 929, 942 (5th Cir. 1994), see also, U.S.S.G.§ 1B1.3(a)(1). Under § 1B1.3(a)(2), relevant conduct is defined as "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." Thus, a defendant is responsible for all "reasonably foreseeable" quantities of contraband that were within the scope of the criminal activity that he jointly undertook. See U.S.S.G. § 1B1.3 comment. (n.2(ii)). The reasonable foreseeability criteria under the Guidelines requires a finding separate from a finding that the defendant was a conspirator. To determine the amount to attribute to a defendant at sentencing, the court must make two separate findings: (1) the quantity of drugs in the entire conspiracy, and (2)

10

the amount which each defendant knew or should have known was involved in the conspiracy. See Puig-Infante, 19 F.3d at 942 (citation omitted). When calculating the amount foreseeable to the defendant, a court may consider the defendant's relationship with the co-conspirators and his role in the conspiracy. See id. Furthermore, an individual dealing in large quantities of controlled substances "is presumed to recognize that the drug organization with which he deals extends beyond his 'universe of involvement.'" Id. (citing United States v. Thomas, 963 F.2d 63, 65 (5th Cir. 1992)). At sentencing, a court may rely on the presentence report (the "PSR") and other evidence not admissible at trial as long as it has sufficient indicia of reliability. See United States v. Vital, 68 F.3d 114, 120 (5th Cir. 1995). We will not disturb a district court's factual findings regarding drug quantity absent a showing of clear error. See United States v. Johnson, 127 F.3d 380, 403 (5th Cir. 1997). A factual finding is not clearly erroneous if it is plausible in the light of the whole record. See United States v. Saunders, 942 F.2d 894, 897 (5th Cir. 1991).

After a close review of the record, in particular the trial and sentencing hearing transcripts and the PSR, we find t hat the district court did not commit clear error when it attributed to Castillo-Sanchez the marijuana quantities logged in the ledgers recovered from his residence. Castillo-Sanchez chiefly argues that the quantities in the ledgers should not have been attributed to him because: (1) the ledgers do not reveal when the entries were made; and (2) the ledgers do not reveal whether the quantities logged were part of the conspiracy charged. However, the evidence adduced at trial established that the drug ledgers were found in Castillo-Sanchez's residence. A government expert testified that the ledgers reflected the weights and quantities of marijuana. Also, the officers recovered from Castillo-Sanchez's brother a page from one of the ledgers. The district court also found that one of the quantities reflected in the torn page recovered from Castillo-Sanchez's brother

11

was almost the exact weight of marijuana that was delivered at Castillo-Sanchez's residence the day that they were arrested. Furthermore, Castillo-Sanchez's brother admitted that he drove the van loaded with the marijuana while Castillo-Sanchez drove the Camry to maintain counter-surveillance. Although Castillo-Sanchez argues that the court should have given weight to his affidavit in which he denies any involvement with the drug quantities reflected in the ledgers, we nonetheless agree with the district court's observation at sentencing in that:

> [T]he levels of trust [] demonstrated between them in exchanging the vehicles and exercising control over the drug ledgers, in having access to the home where the particular day's load was stored, all demonstrate a high level of activity, and plus the surveillance that I might observe and counter surveillance operations that they conducted, all demonstrate the ease with which they operated and the experience which demonstrated which reflects indeed that this was not as [] Victor Hugo Sanchez falsely stated in his affidavit was not a one-time event.

(Tr. Vol. 8, at 13). The court's decision whether to accept or reject Castillo-Sanchez's affidavit rests upon a credibility determination, and thus, we interfere with that decision only if it is clearly erroneous or an abuse of discretion. Cf. United States v. Collins, 972 F.2d 1385, 1403 (5th Cir. 1992). Thus, the district court's finding regarding drug quantity was not clearly erroneous.

Finally, Castillo-Sanchez's claim that the computation of the amount of drugs is improper under § 841, is subject to review only for plain error because it was not raised below. FED. R. CRIM. P. 52(b); United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994) (en banc). Plain error is that which is obvious and affects substantial rights of the defendant. Calverley, 37 F.3d at 164. Where plain error is shown, this court has discretion to correct the error, but generally does so only where "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Ravitch, 128 F.3d 865, 869 (5t h Cir. 1997). Because this is a challenge to the district court's factual findings and the sentence Castillo-Sanchez received fell within the range

allowed under the statute, this claim is without merit.  See Robertson v. Plano City of Texas, 70 F.3d 21, 23 (5th Cir. 1995) (holding asserted errors which involve questions of fact have only a remote possibility of rising to the level of obvious error).

III.

CONCLUSION

For the reasons stated above, we AFFIRM the convictions and sentence.

AFFIRMED