**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 93-2633

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEITH WENDELL COOPER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(January 13, 1995)

Before JONES and STEWART, Circuit Judges, and DUPLANTIER[*], District Judge.

CARL E. STEWART, Circuit Judge:

This case involves the issue of whether a suspect's Fourth Amendment rights were violated when police conducted a pat-down search of his outer clothing and subsequently arrested him for possession of crack cocaine, which the officer could identify by feeling through the defendant's clothing. Finding no error in the district court's denial of defendant's motion to suppress evidence of the drugs, we AFFIRM.

Facts and Proceedings Below

Defendant, Keith Wendell Cooper, was convicted after a bench trial on federal charges of possession with intent to distribute

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

more than 50 grams of cocaine base (crack) and was sentenced to 121 months incarceration, five years of supervised release, and a $50 special assessment. He filed a pretrial motion to suppress, alleging that the search of his person was unconstitutional because a reasonable person would not have understood that he could refuse the officer's request to conduct a pat-down body search. After a hearing on the motion was conducted in conjunction with the bench trial, the district court denied the motion, finding that Cooper consented to the search.

On February 1, 1993, Houston police officers Bill Corley and James Ellis were conducting surveillance at the Greyhound Bus Station looking for narcotics traffickers. Officers Corley and Ellis were both twenty-three year veterans of the Houston Police Department. Corley had worked in the narcotics division of the department for eight years. Ellis was sergeant in the narcotics division. Corley and Ellis were assigned to the narcotics interdiction unit, regularly conducting surveillance at train stations, bus stations, airports, etc., to identify drug traffickers.

Officer Corley testified at the suppression hearing/trial that he observed defendant, a 26-year-old man with a tenth grade education, entering a side door on the south side of the gate area of the station ("side gate" no. 14). The side gate was actually a passageway for inbound and outbound bus passengers, called a "boarding gate." At the time, no bus was parked at the gate. Corley had no prior knowledge concerning Cooper. Corley testified

that Cooper rapidly scanned the area, looking back several times, as he walked across the gate area to Gate 9 carrying a small gym bag. Corley testified that he first became suspicious of Cooper because he entered the station through the side gate, something which he deemed unusual and which he deemed characteristic of narcotics traffickers. Corley also testified that he does not remember ever witnessing anyone entering the station through that gate who did not turn out to be carrying drugs. He testified that drug traffickers are aware that police watch the ticket counter, so they enter through the side gate, which allows them to bypass the counter. Corley also testified that Cooper constantly and rapidly scanned the area, carried a small bag that would not hold many clothes, and arrived very shortly before the bus was due to leave. These factors also made the officers suspicious, because these actions are characteristic of drug traffickers. Corley testified that Cooper once again scanned the area behind him as he boarded the bus.

Cooper testified for the limited purpose of the motion to suppress. He denied that he was looking back over his shoulder as he walked through the bus station lobby. He confirmed that he entered the side entrance to the terminal, but claimed to have entered through gate no. 15 and that he walked directly to a pay phone to make a collect call. He claimed to have then waited until the bus was called and then walked through gate no. 9 to board the bus. For the next 5-6 minutes, he claimed he donned earphones and listened to a personal radio.

3

Corley further testified that after Cooper boarded the bus, their suspicions aroused, he and Ellis made inquiries and ascertained that Cooper was headed for Pascagoula, Mississippi. They then boarded the bus Cooper had boarded. Ellis sat down in the driver's seat and Corley proceeded to the rear of the bus and entered the seat behind Cooper. Corley testified that as he walked past Cooper, he observed that Cooper was squirming around in his seat and that below Cooper's belt there was an unusual horizontal bulge between the crotch area and the waistline. Corley testified that this area is a common place for drug traffickers to hide drugs because male police officers may feel hesitant about carefully patting down this area of a male suspect, and they may not do a thorough enough job to locate the drugs. Cooper insisted that the package of crack was not discernable beneath his clothing, because he was wearing baggy clothes.

Corley testified that he identified himself as a police officer and asked if he could talk to Cooper. Ellis was out of earshot of the ensuing conversation between Cooper and Corley, although he confirmed that Corley displayed his police badge to Cooper at the outset of their conversation. Corley admitted that he did not advise Cooper that he did not have to speak with him; nevertheless, Cooper engaged in a conversation with Corley.

Corley testified that he asked Cooper his destination, to which Cooper replied Pascagoula, Mississippi. In response to Corley's question regarding the duration of his visit, Corley stated that Cooper answered that he intended to remain in

4

Pascagoula one day. Corley testified that when Cooper produced the bus ticket for Corley's inspection, his hands were shaking. Corley also testified that Cooper became visibly more shaken as the conversation ensued. Corley observed that the ticket was a one-way ticket and had been purchased two hours prior to Cooper's arrival at the bus station. Corley found the advance purchase and the fact that Cooper had purchased only a one-way ticket when he knew he was going to be in Pascagoula only one day both suspicious and characteristic of drug traffickers. Corley maintains that he gave the ticket back to Cooper and asked if he had any identification, to which Cooper replied that he did not. Corley stated he then advised Cooper that he was a narcotics officer and that Cooper immediately asked Corley if he wanted to look in his gym bag.[1] Ellis also testified that he saw Cooper pull out the bag and place it on an adjacent seat before Corley inspected it. The gym bag contained a shirt and pair of pants.

Corley testified that he then asked Cooper if he "wouldn't mind standing up and letting me pat him down." According to Corley, Cooper replied "no" and stood up. Officer Ellis also testified that Cooper stood up voluntarily, although he could not hear the conversation between Cooper and Corley. As Corley patted Cooper down, he felt the suspicious bulge between his waist and crotch. He stated that he immediately recognized the contents of the bulge to be round wafers of crack cocaine. The officer said he

---

[1]Corley said he recognized the offer to inspect the bag as a diversionary tactic often employed by individuals carrying drugs on their person.

asked Cooper to identify the bulge, and that Cooper remained silent. The officer then placed Cooper under arrest, handcuffed him, and escorted him out of the bus. Corley testified that Cooper did not protest or withdraw his consent while conversing with the officer. Once Cooper was taken off the bus and led to a bus terminal office, Corley located nine wafers of crack cocaine in a plastic baggie inside of Cooper's underwear, weighing approximately 241 grams (8.5 - 9 oz.) and having a street value of approximately $19,000.

After he was given his Miranda warnings, Corley stated that Cooper blurted out "Damn, who snitched me off?" Corley estimated that fewer than five minutes had elapsed from the moment the officers entered the bus until Cooper consented to the pat-down, was arrested, and was escorted off the bus.

Cooper's version of what happened when Corley approached him differs. Cooper testified that Corley approached him from the aisle, identified himself as a police officer and displayed his badge. He says that the officer asked him if he was carrying any firearms, and peered at the gym bag. Cooper claims that Corley asked him if the bag contained narcotics, to which Cooper said he responded "no" and offered to let the officer inspect the bag. Cooper testified that Corley then inspected Cooper's gym bag, patted Cooper down while he was still seated, and then pulled Cooper up and searched him again. When Corley was questioning him and patting him down, Cooper claimed he was "a little scared" and felt that it he had tried to move, Corley "probably [would have

become] physical."  Cooper testified that he did not feel that he could leave the bus.  Cooper testified that he did not consent to a body search at any time, and that Corley began touching him as soon as he showed his police badge.  Cooper said that he only consented to a search of his bag.  He said that he did not verbally object when Corley touched him because he was scared.

The district court apparently accepted the officers' version of what happened during the encounter, thereby rejecting Cooper's contention that he was jerked to his feet and searched.  The district court concluded that Cooper had consented to the pat-down.

### Standard of Review

Appellate review of a district court's ruling on a motion to suppress based on testimony at a suppression hearing is subject to the clearly erroneous standard.  United States v. Bradley, 923 F.2d 362, 364 (5th Cir. 1991).

The Government has the burden of proving by a preponderance of the evidence that a consent to search was voluntary.  United States v. Yeagin, 927 F.2d 798, 800 (5th Cir. 1991); United States v. Ponce, 8 F.3d 989, 997 (5th Cir. 1993).  The voluntariness of consent is a question of fact to be determined from a totality of the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct 2041, 2048, 36 L.Ed.2d 854 (1973).  We review a trial court's finding of voluntariness for clear error.  United States v. Olivier-Becerril, 861 F.2d 424, 425-26  (5th Cir. 1988).

This court considers six factors when evaluating the voluntariness of consent:

(1) the defendant's custodial status;

(2) the presence of coercive police procedures;

(3) the extent and level of the defendant's cooperation with the police;

(4) the defendant's awareness of his right to refuse consent;

(5) the defendant's education and intelligence

(6) the defendant's belief that no incriminating evidence will be found.

United States v. Ruigomez, 702 F.2d 61, 65 (5th Cir. 1983); United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993). **No one factor is dispositive in determining the voluntariness of consent.** *See* United States v. Gonzales, 842 F.2d 748, 754-55 (5th Cir. 1988), overruled on other grounds, United States v. Hurtado, 905 F.2d 74 (5th Cir. 1990); United States v. Ruigomez, 702 F.2d at 65.

The ultimate conclusion on Fourth Amendment issues drawn from the evidence is reviewed de novo. United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993).

## Analysis

The district court found that Cooper's lack of resistance amounted to consent for the police officer to pat him down. The court therefore concluded that the search was consensual. While we disagree that nonresistance amounts to consent,[2] we nonetheless

---

[2] For constitutional purposes, nonresistance may not be equated with consent. United States v. Most, 876 F.2d 191, 199 (D.C. Cir. 1989).

8

conclude that the district judge properly denied the motion to suppress.

Cooper alleges that the district court erred in finding that he consented to the pat-down search, because a reasonable person in his circumstances would have felt compelled to cooperate. Thus, he asserts that his lack of resistance to the search was not tantamount to consent. He points out that the police officer never informed him that he did not have to cooperate. Given the indicia of authority and power that police carry, Cooper argues that a reasonable man would have felt compelled to cooperate. The judge specifically found that Cooper's lack of resistance amounted to consent. Cooper argues that a reasonable person would have felt compelled to acquiesce in the officer's requests. Cooper argues that compelled acquiescence is not consent that is freely and voluntarily given.

Cooper cites Florida v. Bostick, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) in support of his position that Corley's request to pat-down Cooper was a seizure for Fourth Amendment purposes. In that case, the Supreme Court considered the police practice of boarding stopped passenger buses and approaching seated passengers to ask questions and request consent to search. The Court concluded that such a practice does not amount to a seizure in all instances, but the Court suggested that such a confrontation could become a seizure if a reasonable person would not have felt free to decline the officers' requests or to terminate the encounter. Under Cooper's argument, the police officer's conduct constituted an

9

illegal seizure vitiating any consent, implied or otherwise, Cooper might have given.[3]

*The three types of police-citizen encounters*

Our approach begins with some preliminary observations. There are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment. The first is a consensual encounter in which an individual willingly agrees to speak to police officers. Such contact may be initiated by the police without any objective level of suspicion. Without more, a consensual encounter does not amount to a "seizure" under the Fourth Amendment. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . ask to examine the individual's identification . . . ; and request consent to search his or her luggage . . . as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick, *supra*, 111 S.Ct. 2382, 2386.

The second type of encounter, based on Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), involves a limited investigative stop. Prior to Terry v. Ohio, any restraint on the person amounting to a seizure for purposes of the Fourth Amendment was invalid unless justified by probable cause. Terry created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable

---

[3]*See* Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), discussed *infra*.

suspicion that a person has committed or is about to commit a crime.

In _Terry_, a police officer observing three men on the street became suspicious of their behavior. Although he was unable to say precisely what first drew his eye to them, the 39-year veteran officer noted that the men were strolling repeatedly back and forth in front of a store and concluded that they appeared to be "casing" the establishment, contemplating a robbery. The officer approached the three men, identified himself as a police officer, and asked for their names. Subsequently, he spun one of them around and patted him down on the outside of his clothing and felt a pistol, which he subsequently retrieved by removing the overcoat in which it was located. He patted down the other two suspects, and he retrieved a revolver from another. The Supreme Court held that the limited frisk of the suspect's outer clothing to discover weapons was justified in light of the officer's reasonable suspicion based upon articulable facts that criminal activity might be afoot. _Terry_, 20 L.Ed.2d at 911.

The third type of police-citizen encounter is an arrest -- plainly a Fourth Amendment "seizure" that must be based on probable cause. A warrantless full-blown body search pursuant to a lawful arrest is permissible.

_The encounter between Corley, Ellis, and Cooper_

A proper analysis of this case requires us to carefully follow the chain of events leading up to the full search of Cooper during

which the drugs were found, in order to determine if Cooper's Fourth Amendment rights were violated at any time.

The initial contact with Cooper occurred when the officers boarded the bus and began to ask Cooper questions. In Bostick, supra, such a police procedure of boarding buses and asking questions has been deemed constitutional unless a reasonable person would not have felt free to terminate the encounter or decline the officer's requests.[4] After Officers Corley and Ellis had noted Cooper's suspicious manner of entering the bus station,[5] and had boarded the bus, Corley identified himself as a police officer to Cooper and began to question him, asking for his ticket and identification. We conclude that this initial contact with Cooper clearly was a legitimate and completely consensual citizen-police encounter to which a reasonable person would have felt free to

---

[4]The Supreme Court noted in Bostick that the mere fact that the suspect did not feel free to leave the bus did not mean the police had seized him. Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were thus confined in a sense, the Court noted, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive. A similar observation seems in order here. Moreover, we also note that it seems more likely that Cooper would have been in an optimal position to refuse the officer's requests -- he knew the bus was scheduled to depart soon, so he knew the officers were going to have to get off the bus or else be headed to Pascagoula, Mississippi. Thus, he had a superior opportunity to hold them in abeyance.

[5]Although Cooper asserts that he did not enter through the gate indicated by the police, a careful review of the district court's ruling indicates that the judge accepted the police officers' testimony and disbelieved Cooper. The judge noted that "[t]here are lots of reasons that Mr. Cooper could have entered through the gate side," implicitly finding that Cooper had in fact entered through the side gate as the officers suggested.

12

decline the officer's request or terminate the encounter. *See* United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870 (1980). The officers did not brandish their weapons or attempt to detain Cooper in any way during the initial conversation on the bus.[6]  If there has been no detention, no constitutional rights have been infringed.  Florida v. Royer, *supra*.[7]

Cooper contends that he did not feel he could terminate the encounter or refuse the officer's requests.  He argues that the encounter with Corley lost its consensual nature and that he was illegally seized for Fourth Amendment purposes the moment the officer asked him for permission to search him.  We disagree.  We conclude that the encounter between Corley and Cooper remained consensual throughout, or at most, did not exceed the bounds of a permissible Terry-type investigative stop, and that the officers

---

[6]There is also no allegation by Cooper that the officers were attempting to prevent his possible escape from the bus by virtue of the fact that officer Ellis positioned himself at the front of the bus.  In fact, there is nothing to indicate that Cooper knew that Corley and Ellis were together or that Ellis was a police officer.  Thus, he could not have possibly felt that he was "hemmed in" by Ellis at the bus door and Corley behind him.

[7]Royer involved a consent to search a suspect's luggage at an airport.  The suspect, who allegedly fit the so-called "drug courier profile" was approached by two airport detectives.  Upon request, he provided his airline ticket and driver's license.  Without returning the ticket and license, the detectives asked the suspect to accompany them to a small room approximately 40 feet away.  Royer complied.  The detectives retrieved his luggage without consent and brought it into the room.  Royer subsequently consented to a search of the suitcases, where drugs were found.  The Supreme Court held that although Royer had consented to the search, his consent was tainted because the law enforcement officers' actions exceeded the permissible bounds of an investigative stop.  We conclude that a different result is in order here, because we find that, at most, the police officer's actions were within the permissible bounds of a Terry-stop.

had the right to conduct such an investigative stop based upon their reasonable suspicion based on articulable facts that indicated Cooper might be carrying drugs.

Upon being approached by Corley, Cooper voluntarily answered the officer's questions, produced his ticket, and consented to a search of his gym bag.  In fact, he was the one who offered to have the bag searched.  As a result of the consensual encounter with Cooper, Corley learned that Cooper's ticket had been paid for in cash several hours before departure, that Cooper was staying in Pascagoula just one night and yet purchased only a one-way ticket, and that Cooper allegedly was not carrying any identification.  Corley testified that all these factors are indicative of a narcotics trafficker.  When combined with the fact that Corley had seen Cooper enter the station through the boarding gate,[8] had observed Cooper squirming in his seat, had seen the suspicious bulge[9], had understood Cooper's attempt to draw attention to his

_____

[8]*See* United States v. Glover, 957 F.2d 1004, 1010 (2d Cir. 1992).  In that case, our colleagues of the Second Circuit recognized that an officer had reasonable suspicion to justify a Terry stop of a passenger who, *inter alia*, entered a bus terminal through a different gate from all the other passengers.  As in Glover, we feel that Cooper's actions in this regard may have been reasonably suspicious to the officers.  As noted *infra*, Corley testified that he had never seen anyone entering through that gate who did not turn out to be carrying drugs.  While this behavior taken alone would not be enough to justify an investigative stop, all the factors observed by the officers, taken together with the information gleaned during the consensual encounter, justified a Terry stop.

[9]Although Cooper contends that the bulge was not visible, the district court implicitly accepted the officer's contention that the bulge was visible in light of his comment there is "nothing suspicious about being lumpy."  In light of the size and shape of the pack of drugs, it was not clearly erroneous for the district

14

gym bag as a diversionary tactic, and had noted Cooper's nervousness, we conclude that while none of the factors noted by the police officers constituted probable cause for an arrest or a warrantless full-blown search of the defendant's person, the officers did have reasonable suspicion based upon articulable facts to justify a Terry stop.

Thus, the consensual encounter arguably was transformed into a limited Terry detention. Even if Cooper felt detained in some way, such detention was justified under Terry in light of the reasonable suspicion the officers had. Thus, Cooper's consent was not tainted by an illegal seizure.

We conclude that the district court correctly held that Cooper consented to the pat-down search, although we disagree with the Court's conclusion that mere nonresistance equates with consent. It is undisputed that Cooper voluntarily offered his gym bag to be searched. We find from examining the entire record that Cooper

---

court to have concluded that the bulge was visible. Moreover, Cooper's contention that the bulge was not visible to Corley may have been given less weight by the district judge, since Corley was in an optimal position to testify as to what he could or could not see. Cooper may have honestly believed the bulge was not visible when in fact it was.

While the district court rejected the position that the "suspicious bulge" was an articulable fact contributing to the officer's reasonable suspicion that criminal activity was afoot, we disagree. A large bulge located in such an unusual place on a suspect may be a factor warranting reasonable suspicion. *See* United States v. Lehmann, 798 F.2d 692 (4th Cir. 1986) (officer's observation of rounded corners of a package showing through suspect's pants in the crotch area, plus suspect's attempts to conceal the bulge by pulling down his jacket in front, justified seizure); *cf.* United States v. Wilson, 953 F.2d 116 (4th Cir. 1991) (a coat pocket is a usual location for a bulky object and did not provide the officers reasonable suspicion under Terry.)

15

consented to the pat-down, just as he had consented to the search of the gym bag. Officer Corley testified that he asked Cooper if he would mind a pat-down, to which Cooper replied "no" and stood up. Officer Ellis corroborates that Cooper stood up, thereby discrediting Cooper's claim that he was yanked up. As noted above, in denying the motion to suppress, the district court clearly rejected any claim of coercive police behavior. Moreover, the record indicates that the entire encounter lasted just a few minutes, thereby negating any possibility that the police may have worn down the defendant's resolve through persistence. Thus, we agree with the district court's ultimate determination that Cooper consented to the pat-down search.

An analysis of the six Ruigomez factors, supra, supports this conclusion. The first factor, i.e., the defendant's custodial status, is discussed above. The defendant was arguably not in any sort of custodial status. At most, he was the subject of a permissible Terry stop at the time he gave consent to the search. The second Ruigomez factor, the presence of coercive police procedures, was clearly rejected by the district court, as discussed above.

The third factor is the extent and level of defendant's cooperation with police. As discussed above, the defendant had answered all of Corley's questions, produced his ticket when requested, and even volunteered to a search of his gym bag. The record also reflects that he stood up voluntarily prior to the pat-down. His clear cooperation militates in favor of a finding of

16

consent. With regard to the fourth factor, the defendant's awareness of his right to refuse consent, the Government cites Schneckloth v. Bustamonte, *supra*, in support of its position that there is no requirement that the government establish knowledge of the defendant's right to refuse consent. While the government makes a valid point that there is no <u>absolute</u> requirement that the government establish that the defendant knew he could refuse consent, the defendant's awareness of this right is nonetheless a factor under the six-part test. However, we do not find this factor dispositive.

The fifth factor is the intelligence and education of the defendant. The defendant in this case had completed the tenth grade, although he subsequently dropped out of high school. We do not find him lacking the requisite education or intelligence to give valid consent to the search. With regard to the sixth factor, defendant's belief that no incriminating evidence will be found, we note that Cooper probably did not think Corley would be able to locate the drugs by the pat-down, much less identify the package as containing crack cocaine. This factor militates in favor of our finding that Cooper consented to the search. Accordingly, under the six <u>Ruigomez</u> factors, we conclude that Cooper's consent to the search was voluntary.

Once the officer felt the bulge, he was able to identify it as crack cocaine because he could feel the wafers and was very familiar with their size and shape. As an officer with many years of experience and well-acquainted with narcotics, Corley had

probable cause to arrest Cooper at that point for possession of crack cocaine. Cooper was not seized for Fourth Amendment purposes until this point, when he was arrested and taken off the bus. The crack was subsequently retrieved from Cooper's underpants. A full-body search pursuant to a lawful arrest is permissible even without a warrant.

## Conclusion

For the foregoing reasons, we conclude that the motion to suppress evidence was properly denied. We AFFIRM.