# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 22-30710

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2024

Lyle W. Cayce
Clerk

KARL VON DERHAAR,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

KHALID WATSON, *in both his individual and official capacity*; MICHAEL STALBERT, *in both his individual and official capacity*; KIM WILLIAMS, *in both her individual and official capacity*,

*Defendants—Appellants/Cross-Appellees*,

DARRYL WATSON, *in both his individual and official capacity*; SHAUN D. FERGUSON, *Superintendent of the New Orleans Police Department, in his official capacity*; LAWRENCE JONES, *in both his individual and official capacity*; NEW ORLEANS CITY, *through the Mayor of the City of New Orleans, Latoya Cantrell*,

*Defendants—Cross-Appellees*,

CONSOLIDATED WITH

———————————

No. 22-30718

———————————

KARL VON DERHAAR,

*Plaintiff—Appellant*,

*versus*

SHAUN D. FERGUSON, *Superintendent of the New Orleans Police Department, in his official capacity*; NEW ORLEANS CITY, *through the Mayor of the City of New Orleans, Latoya Cantrell*,

Defendants—Appellees.

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:21-CV-1653, 2:21-CV-1653

———————————————————

Before HIGGINBOTHAM, HIGGINSON, and DUNCAN, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

New Orleans Crime Lab employee Karl Von Derhaar warned superiors about safety breaches and inaccuracies in a drug-testing method. Von Derhaar contends that, rather than address those concerns, the Lab mandated that all employees be tested using that very method. Von Derhaar requested placement on unpaid leave. Lab supervisor Sergeant Michael Stalbert then went to Von Derhaar's home but got no answer because he went to the wrong apartment. He came back the next day with two officers who were also armed. What followed is fully captured on body camera video. Von Derhaar, standing in his front doorway, calmly declined to speak with Stalbert. Stalbert told Von Derhaar that he was required to speak with Stalbert and would be escorted out of his home. Von Derhaar ultimately agreed that he would get dressed and then speak, but Stalbert suddenly announced that he was coming in with Officer Khalid Watson and entered. Though Stalbert told Von Derhaar that this was a wellness check, neither officer looked for anyone in distress nor appeared to have noticed anything out of the ordinary. Von Derhaar's young child played calmly. His girlfriend then appeared and asked what anyone witnessing this scene would want to

2

know:  What in the world is going on?  Von Derhaar told her and an unidentified person he called on the phone that the officers had forced their way in.  Stalbert ordered Von Derhaar out of his home, where another Crime Lab supervisor, Lieutenant Kim Williams, waited.  When Von Derhaar declined to go with the officers, Williams called Lieutenant Darryl Watson[1] at the Police Integrity Bureau (PIB) and then relayed to Von Derhaar that he was required to go to PIB headquarters because PIB was concerned for his wellbeing.  Von Derhaar's repeated requests to return to his home and collect his phone were denied, and he was ultimately taken to a police car, patted down, and driven away.

Von Derhaar sued the City of New Orleans, its police superintendent, the officers present, and Darryl Watson under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from unreasonable searches and seizures.  Some defendants, though not Darryl Watson, moved for summary judgment, arguing that there was no municipal liability for the City and superintendent and that qualified immunity shielded each officer on the scene.  The district court granted summary judgment to the City and superintendent on all claims.  On the search claim, the district court granted summary judgment to Williams and Khalid Watson but denied it to Stalbert.  On the seizure claim, the district court denied summary judgment to Stalbert, Williams, and Khalid Watson.  These appeals and cross-appeals followed.

We DISMISS for want of appellate jurisdiction the appeals of the denial of summary judgment to Stalbert on the issue of punitive damages, the summary judgment to Khalid Watson on the search claim, and the summary judgment to the City and superintendent, and therefore DENY as moot Von

---

[1] To avoid confusion between Officer Khalid Watson and Lieutenant Darryl Watson, we refer to each by his first and last name throughout this opinion.

Derhaar's motion for certification of that order. We AFFIRM the denial of summary judgment to Stalbert on the search and seizure claims. We REVERSE the denial of summary judgment to Williams and Khalid Watson on the seizure claim.

I

Von Derhaar told his immediate supervisor at the Lab that he was concerned about safety and procedural lapses and was worried that tests could not distinguish between marijuana and hemp. Lab supervisors Stalbert and Williams learned of Von Derhaar's concerns. These concerns were allegedly ignored. Von Derhaar was then told that, as a new condition of his employment, he would be required to take drug tests using the testing method that he had warned was inaccurate.

Von Derhaar requested leave without pay. Stalbert avers that he told Von Derhaar to come discuss protocol for doing so but, despite promises otherwise, Von Derhaar did not go speak with Stalbert. Stalbert alleges that, later that day, he went to Von Derhaar's apartment on the orders of his supervisor, Captain Simon Hargrove, but received no response. The next day, Stalbert alleges that he went to speak to PIB Commander Sabrina Richardson. Darryl Watson was brought into this conversation based on a purportedly relevant, recent experience, which was never specified.[2] According to Stalbert's testimony, he explained that he thought it would be necessary to enter Von Derhaar's home to ensure Von Derhaar had not harmed himself or others.

_____

[2] Stalbert testified that Darryl Watson "said that he had just handled a situation similar to this and that he had the expertise to guide [Stalbert] [to do] what [Stalbert] needed to do."

Stalbert and Williams went to Von Derhaar's home. Stalbert learned that he had knocked on the wrong apartment door the previous day. Stalbert and Williams allege that they knocked on Von Derhaar's correct door for fifteen minutes without a response, at which point they requested an officer with a body-worn camera and arranged for a standby ambulance. Khalid Watson arrived with a body-worn camera. A description of its footage follows.

Von Derhaar, who was wearing only boxers, answered and partially opened his door. Stalbert asked how Von Derhaar was, to which Von Derhaar responded that he was "doing good" but "actually d[idn't] want to talk right now." Stalbert said, "well you need to talk to me . . . you have to" and moved directly in front of the door, with Williams a few feet behind him and Khalid Watson behind her. Stalbert repeated this several times and Von Derhaar responded that "there has been a problem with working conditions at the lab." Stalbert told Von Derhaar that he and his fellow officers were "going to come and escort you, make sure that you put some pants on." Rather than respond to Von Derhaar's questions about where he would be taken, Stalbert said "you are going to put pants on" and "at that point we are going to talk further."

Von Derhaar agreed to dress and tried to close his door. He could not do so, however, because Stalbert stepped onto the threshold and announced "we are coming in, okay," which Von Derhaar repeated as Stalbert stepped over the threshold and pushed open the door. With his child playing on the couch next to him, Von Derhaar called an unidentified person, relayed that "they just forced themselves into my apartment," and asked what he should do given the officers "don't have a right to enter my house without a warrant." Stalbert remained in the room with Von Derhaar and his child. Stalbert told Von Derhaar that he could remain on his phone and that they were just trying to speak with him, explaining that they "respect [Von

Derhaar's] house and family." Von Derhaar told Stalbert that his girlfriend was working. Stalbert insisted that Von Derhaar "need[ed] to step outside" because he did "not want to intrude on [Von Derhaar's house]" and would "explain everything to" Von Derhaar then.

At that point, Von Derhaar's girlfriend walked into the room. Stalbert clarified that Von Derhaar's girlfriend was working from home—this was September 2020—and identified himself as Von Derhaar's supervisor. She asked what was happening and Stalbert finally explained that this was a "wellness check," stated that he had tried to contact Von Derhaar for two days, and made assurances that he would explain to Von Derhaar what was happening. Von Derhaar then asked Stalbert if he should put his hands up, and Stalbert replied that Von Derhaar "work[ed] for the New Orleans Police Department" and was "not under arrest," as Von Derhaar followed him out.

Outside, Von Derhaar and Stalbert met Williams. She told Von Derhaar that he "need[ed] to go to PIB," explaining that officials at PIB "need[ed] to speak with [him] about different things that have been going on" because "they [were] concerned about [his] well-being." When Von Derhaar asked again if he was under arrest, Williams assured him "absolutely not"—but then when asked by Von Derhaar if he was required to go with the officers, Williams said that "PIB said that you need to come to their office." Von Derhaar asked whether he could return to his home and Williams responded that she would call PIB.

Williams relayed to Darryl Watson on the phone that Von Derhaar "said that if he's not under arrest he wants to go back into his house," and Darryl Watson responded, over speakerphone, "tell [Von Derhaar] he is being put back on the clock, he's being ordered to come into work to take this test," presumably referring to the drug test Von Derhaar had raised concerns about. Williams and Stalbert each told Von Derhaar that PIB was ordering

6

him to come in, and Stalbert explained that Von Derhaar was being ordered to take a drug test because Von Derhaar was behaving out of character. Stalbert told Von Derhaar that, while Von Derhaar could refuse assistance at a later point, Von Derhaar was required to come with the officers "under the direction of PIB" because there was concern for his wellbeing. Stalbert said that he would tell Von Derhaar's girlfriend what was happening.

Von Derhaar asked if he was required to go with the officers if he quit his job, and both Stalbert and Williams responded that he was. Von Derhaar asked Williams if he could retrieve his phone from his home and was told "no, you are not going to need it." He asked a second time and was again forbidden by Williams. Williams told Von Derhaar to go to the police car. Khalid Watson, still wearing the body camera, gestured for Von Derhaar to walk in front of him. Von Derhaar then told Khalid Watson and Williams "this isn't legal," and stopped. Williams responded that Von Derhaar was "being ordered" by PIB and had to "keep moving." Khalid Watson and Williams directed Von Derhaar through a parking lot toward a police car. Williams left and Khalid Watson continued, for approximately two minutes, to direct Von Derhaar to the police car.

Once at the police car, Williams rejoined Khalid Watson and Von Derhaar. She told Von Derhaar that "in any police car" "you have to be searched." Khalid Watson then patted Von Derhaar down before directing him to "have a seat" in the back of the police car. Williams confirmed that Von Derhaar had been searched and, while repeating that he was not under arrest, emphasized that Von Derhaar was not being handcuffed "as a courtesy." Stalbert returned, and the three officers agreed to meet at PIB headquarters.

Von Derhaar was driven to PIB headquarters and was permitted to resign from his position at the Lab there.

## II

As relevant here, Von Derhaar sued Stalbert, Khalid Watson, Williams, Darryl Watson, the City, and superintendent under Section 1983 for violating his Fourth Amendment right to be free from unreasonable searches and seizures.  We reach the merits of only the search claim against Stalbert and the seizure claim against Stalbert, Khalid Watson, and Williams because we lack jurisdiction over the appeals of other issues.

## A

The district court granted summary judgment to the City and superintendent, concluding Von Derhaar could not establish municipal liability under Section 1983.  We lack appellate jurisdiction over Von Derhaar's appeal of that order and the district court's order excluding Von Derhaar's municipal liability expert.  We accordingly also deny as moot Von Derhaar's motion for certification of the order granting summary judgment to the City and superintendent.

We lack jurisdiction under 28 U.S.C. § 1291, which grants "jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  "[A] final judgment is normally deemed not to have occurred until there has been a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 171 (5th Cir. 2009) (internal quotation marks and citations omitted).  Not so here, where multiple claims remain against multiple other defendants in the suit.  Nor does this fall within the collateral order doctrine, through which Section 1291 is given its "practical rather than . . . technical construction." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (citations omitted).  That doctrine affords review of a "small class [of decisions] which finally determine claims of right separable from, and

collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Henry*, 566 F.3d at 171 (quoting *Cohen*, 337 U.S. at 546). But "[a]n erroneous ruling on liability," as Von Derhaar argues this was, "may be reviewed effectively on appeal from final judgment." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43 (1995). Additionally, the district court declined certification, so we lack jurisdiction under 28 U.S.C. § 1292(b). *See Von Derhaar v. Stalbert, et al*, 21-cv-01653-ILRL-MBN, ECF 271 (July 5, 2023).

Nor will we exercise pendent jurisdiction, proper only "(1) [i]f the pendent decision is 'inextricably intertwined' with the decision over which the appellate court otherwise has jurisdiction . . . or (2) if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *Escobar v. Montee*, 895 F.3d 387, 391 (5th Cir. 2018) (quoting *Swint*, 514 U.S. at 51). Assuming either was satisfied, we are not exercising jurisdiction over other claims against the City and superintendent, and "this court has never permitted—and has indeed rejected—pendent *party* (as opposed to pendent *claim*) interlocutory jurisdiction." *Harris v. Clay County*, 47 F.4th 271, 276 (5th Cir. 2022) (citations omitted) (emphasis added). While "[o]ther circuits do sometimes exercise pendent party jurisdiction over orders involving municipalities when individuals with qualified immunity also appeal, . . . we do not." *Id.* (footnote and citation omitted).

B

We lack appellate jurisdiction to review the denial of summary judgment to Stalbert on whether punitive damages are available. There is no jurisdiction under Section 1291 because there has not been a "decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Henry*, 566 F.3d at 171. This does

not fall under the collateral order doctrine. *Adelman v. Branch*, 784 F. App'x 261, 268 (5th Cir. 2019) (per curiam). In *Adelman*, we held that the denial of summary judgment on punitive damages was not collateral to the Section 1983 Fourth Amendment claim for which the plaintiff sought punitive damages. *Id.* We explained that "[s]uch a denial does not 'conclusively determine the disputed question' or 'resolve an important issue completely separate from the merits of the action,'" and, instead, "the issue of damages is enmeshed with the merits." *Id.* (quoting *Will v. Hallock*, 564 U.S. 345, 349 (2006)). Furthermore, "[i]f the district court issues a final judgment assessing punitive damages against [the defendant], we may review an appeal of that judgment, meaning that the opportunity for review is not 'irretrievably lost if it is not reviewed in this collateral appeal.'" *Id.* (quoting *Cherry v. Univ. Wis. Sys. Bd. of Regents*, 265 F.3d 541, 546-47 (7th Cir. 2001)).

Finally, this is not an order enumerated under Section 1292(a), nor was it certified pursuant to Section 1292(b). And we do not exercise pendent jurisdiction because the issue is not "inextricably intertwined" with the qualified immunity denial properly before us, nor is it necessary to "meaningful review." *Swint*, 514 U.S. at 51.

C

We also lack appellate jurisdiction to review the grant of qualified immunity to Khalid Watson on the search claim. "[W]hile we may review the *denial* of claims of qualified immunity under the collateral-order doctrine, the doctrine does not encompass orders *granting* qualified immunity." *Walton v. City of Verona*, 82 F.4th 314, 320 (5th Cir. 2023) (citation omitted).

By contrast, we have appellate jurisdiction to review the qualified immunity denial to Stalbert on the search claim and to Stalbert, Khalid Watson, and Williams on the seizure claim. "[T]he denial of qualified immunity on summary judgment is immediately appealable under the

10

collateral order doctrine if based on an issue of law," *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 576 (5th Cir. 2009) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)), but, as we explain below, that "jurisdiction is significantly limited," *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (citing *Mitchell*, 472 U.S. at 530).

## III

We now turn to the denial of qualified immunity to Stalbert on the search claim and to Stalbert, Williams, and Khalid Watson on the seizure claim.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Our inquiry is two-pronged, and we may take those prongs in any order. *Id.* at 236. "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." *Conroe Creosoting Co. v. Montgomery County*, 249 F.3d 337, 340 (5th Cir. 2001). "[D]espite

notable factual distinctions between the precedents relied on and the cases then before the Court," law may be clearly established "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope*, 536 U.S. at 740 (citation omitted). For search and seizure claims, the Supreme Court has cautioned that "courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,'" *Tolan*, 572 U.S. at 657 (quoting *Saucier*, 533 U.S. at 201), while still "tak[ing] care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions," *id.* (citation omitted).

"The standard of review that we apply in an interlocutory appeal asserting qualified immunity differs from the standard employed in most appeals of summary judgment rulings." *Kinney*, 367 F.3d at 347. We have explained that "[w]henever the district court denies an official's motion for summary judgment predicated upon qualified immunity," it "can be thought of as making two distinct determinations[.]" *Id.* at 346. First, it "decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law." *Id.* Second, it "decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Id.* "We lack jurisdiction to determine whether any factual disputes are genuine," the second determination, "and we only consider, as a matter of law, if [any factual disputes] are material." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021). "In reviewing the district court's conclusions concerning the legal consequences—the materiality—of the facts, our review is of course *de novo*." *Kinney*, 367 F.3d at 349.

## A

The district court properly denied qualified immunity to Stalbert on the search claim. Stalbert argued that the entry was consented to, justified by exigent circumstances, and made pursuant to a superior's order.

22-30710
c/w No. 22-30718

We first consider whether there was a constitutional violation. The district court concluded that there were material fact disputes on both consent and exigency that precluded summary judgment.[3] Whether there was consent or exigency is a question of fact. *See United States v. Bass*, 996 F.3d 729, 739 (5th Cir. 2021) (consent); *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) (exigency). In this posture, we ask only whether those fact disputes are material. *See Cope*, 3 F.4th at 204. Although "searches . . . inside a home without a warrant are presumptively unreasonable," "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and "the warrant requirement is subject to certain reasonable exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Consent searches occupy one of these" reasonable exceptions, *Fernandez v. California*, 571 U.S. 292, 298 (2014), as do exigencies in which there is a "need to assist persons who are seriously injured or threatened with such injury," *Brigham City*, 547 U.S. at 403. The factual disputes over whether there was consent or exigent circumstances are therefore material because they go directly to whether this warrantless search was unconstitutional.

––––––––––––––––––––

[3] On consent, the district court stated that "[t]he discrepancy of whether Stalbert had permission to enter the apartment, alone, is a genuinely disputed material fact and requires denial of Stalbert's motion for summary judgment." The district court explained that "Stalbert avers he believed had . . . permission . . . to enter, and [Von Derhaar] never asked him to leave," while "[a]s Von Derhaar tells it, immediately after Stalbert said '. . . and we are coming in, okay?', [Von Derhaar] merely repeated what Stalbert said in apparent disbelief as Stalbert 'force[d] his way through the door.'" On exigency, the district court stated that that the "factual circumstances arguably do not rise to the standard of an exigency" and that "Stalbert did not specify how the plaintiff acted 'erratically'" such that the entry was justified by exigent circumstances. It concluded there were "genuine factual disputes as to whether the officer committed an unlawful entry into [Von Derhaar's] home to conduct a wellness check[.]"

13

We now turn to the clearly established law prong. Considering the standard for summary judgment and our limited review in this interlocutory appeal, we assume these disputed facts as to the existence of consent and exigency for purposes of the clearly established law inquiry. "[T]he law regarding consent and exigent circumstances has been clearly established for some time." *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 424 (5th Cir. 2008). Stalbert asserts that Von Derhaar had been acting "erratically," and that he "believed he had exigent circumstances to enter the apartment." Yet Stalbert testified that "[i]t's not that I was saying that [Von Derhaar] was impaired at that exact moment" but it was instead that Von Derhaar had "sa[id] that he was stressed in some manner" and "did not appear" when Stalbert asked him to come to work. He further testified that "little incidents that happened one at a time and separate and spread out" justified his conclusion that there was an exigency. He offers no further explanation or evidence of danger, nor does he attempt to explain what he perceived that would call for "emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403.

Stalbert also argues that his conduct was "objectively reasonable at the time of the incident," *Conroe Creosoting Co.*, 249 F.3d at 340 (citation omitted), because "making sure that the occupants of Von Derhaar's household were also safe" was "in accordance with his orders from [Sabrina] Hargrove and [Darryl] Watson."[4] On the record at this stage, even accepting that the entirety of the instruction to Stalbert was to "mak[e] sure that the occupants of Von Derhaar's house were also safe," his entry into the home was objectively unreasonable after he engaged Von Derhaar in conversation for a full minute, and observed no safety threat that he has articulated to the

---

[4] We discuss in greater depth below the significance of following orders in our qualified immunity doctrine.

district court or our court. Furthermore, even if we were to assume that Stalbert's initial entry was not objectively unreasonable, that says nothing about why Stalbert remained in Von Derhaar's home for over four minutes when nothing appeared out of the ordinary and he was able to see that the other occupants of the home, Von Derhaar's girlfriend and child, were fine. The district court therefore did not err in concluding that material fact disputes required denying summary judgment to Stalbert on the search claim.

B

On the seizure claim, the district court properly denied summary judgment to Stalbert but erred in denying summary judgment to Williams and Khalid Watson.

Von Derhaar argues that Stalbert seized him when Stalbert ordered him out of his home; Williams seized him when Williams ordered Von Derhaar to come with the officers to PIB and refused Von Derhaar's request to re-enter his home to collect his phone; and Khalid Watson seized him when Watson patted him down, directed him into the police car, and then drove him to PIB headquarters.

We begin with the constitutional violation. "[C]ertain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime," *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995), while an arrest is "plainly a Fourth Amendment 'seizure' that must be based on probable cause," *id.* at 146. Crucially, no officer argues that there was even articulable suspicion to seize Von Derhaar. They instead contend that there was no constitutional violation because he was not seized and, even if he had been seized, that seizure was constitutional because he was ordered to go to PIB as an employee to take a drug test. Both arguments fail.

15

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained," and "[o]nly when such restraint is imposed is there any foundation . . . for invoking constitutional safeguards." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). It is therefore not dispositive, contrary to the officers' assertions, that Von Derhaar was told he was not under arrest nor that the officers allegedly would have allowed Von Derhaar to leave if he had so attempted. A seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. "Examples of circumstances that may indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Here, Von Derhaar, in the presence of three armed officers, repeatedly stated that he did not want to go to PIB but was repeatedly told that he was "ordered" to go. Von Derhaar said that he wanted to go back to his home, even just to retrieve his phone, and was told that he could not. He was then taken to a police car, patted down, and ordered to enter it—and informed he would not be handcuffed "as a courtesy." Applying *Mendenhall*, these circumstances indicate that Von Derhaar was seized by each officer.

This analysis is unchanged by the fact that Von Derhaar also worked for the Lab. Of course, the government's interest in regulating certain employees can create "'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 620 (1989) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987)). One such departure has, for example, been justified in required, post-accident drug tests of railroad workers given the significant public safety interest and "diminished" expectation of privacy the workers hold. *Id.* at 627. But two

16

key features from that balancing are absent here. First, that balancing hinges on the fact that employees are subject to significant restrictions in movement *at work* and so the *at-work* drug test adds comparatively little burden. *Id.* at 624–25. Second, permissible drug-testing policies are those that are "defined narrowly and specifically," like testing immediately after an accident. *Id.* at 622. Von Derhaar, though, was at home and was told that he would be put back on the clock for the purpose of ordering him to come in to take a drug test.[5] As the district court explained, while "[p]erhaps plaintiff," as an employee, "could be ordered to provide a urine sample for drug testing purposes, . . . a reasonable jury could find that hauling plaintiff to [PIB] against his wishes goes too far and thus, a reasonable trier of fact could find that an illegal seizure occurred."

We next consider whether the constitutional violation was clearly established when it occurred. The officers contend that each acted pursuant to orders. An individual may "act[] reasonably in following [orders]"—such that following those orders does not violate clearly established law—when the orders are "not facially outrageous." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000).

We agree with Von Derhaar that Stalbert seized him in violation of clearly established law when Stalbert ordered him from his home. Stalbert does not point to any order, from a superior or otherwise, that he was following at the time to bring Von Derhaar out of his home or to continue any contact with Von Derhaar after assuring, at most, Von Derhaar's wellbeing.

---

[5] To the extent that there is some ambiguity in the record on whether Von Derhaar was authorized to take his unpaid leave because he had not submitted the requisite paperwork, that does not change the undisputed fact that this all occurred when Von Derhaar was at home. Any discrepancy is a fact question that may not be resolved at this stage.

Stalbert was thus not objectively reasonable in seizing Von Derhaar at this time, and he violated clearly established law in doing so.

On the other hand, both Williams and Khalid Watson point to orders that each was following, and Von Derhaar fails to establish that those orders were "facially outrageous." *Id.* As to Williams, Von Derhaar argues that "Darryl Watson merely conveyed on the phone to Lt. Williams to relay to Mr. Von Derhaar that he was being ordered to take a drug test," not to "escort [Von Derhaar] to PIB in a police vehicle." But this ignores the fuller conversation in which the order was given. Von Derhaar asked Williams whether he was required to go with the officers to PIB headquarters, and she responded that he was. When he asked whether he could return to his home, Williams called PIB and relayed to Darryl Watson that Von Derhaar "said that if he's not under arrest he wants to go back into his house," and Darryl Watson responded, over speakerphone, "tell [Von Derhaar] he is being put back on the clock, he's being ordered to come into work to take this test." In the context of Williams' question to Darryl Watson, Von Derhaar cannot credibly argue that Williams was not ordered to bring Von Derhaar into PIB headquarters. He does not argue that Williams was objectively unreasonable in following this order but instead re-urges that his seizure was unreasonable in violation of the Fourth Amendment. Without argument as to why the order was facially outrageous such that following it was objectively unreasonable, that is insufficient. *See Heaney v. Roberts*, 846 F.3d 795, 805 (5th Cir. 2017) (following order to remove and detain non-disruptive citizen at council meeting was not objectively unreasonable even absent probable cause).

Von Derhaar argues that Khalid Watson "actively participated in the detention and seizure . . . which was beyond the scope of [the] alleged original orders to accompany [Stalbert] and [Williams] solely for purposes of videotaping the wellness check." But Von Derhaar makes no argument as to

the subsequent orders that Khalid Watson received throughout the encounter from Stalbert and Williams to take Von Derhaar to the police car, pat him down before entering it, and drive him to PIB headquarters. Von Derhaar thus fails to carry his burden to show that Williams and Khalid Watson violated clearly established law in seizing him.

We therefore conclude that the district court properly denied qualified immunity on the seizure claim to Stalbert but erred in denying qualified immunity to Williams and Khalid Watson on this claim.

\* \* \*

For the foregoing reasons, we DISMISS Von Derhaar's appeal of the summary judgment to the City and superintendent, including the exclusion of expert testimony; DENY as moot Von Derhaar's motion for certification of that summary judgment; DISMISS Stalbert's appeal of the denial of summary judgment on punitive damages; and DISMISS Von Derhaar's appeal of the summary judgment to Khalid Watson on the search claim. We AFFIRM the denial of summary judgment to Stalbert on the search and seizure claims. We REVERSE the denial of summary judgment to Williams and Khalid Watson on the seizure claim, and REMAND for further proceedings consistent with this opinion.